FILED
2020 Dec-29  AM 09:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| CHRISTINE D. DRAKE, individually and on behalf of others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | COMPLAINT CLASS ACTION |
| BBVA USA BANCSHARES, INC., as named fiduciary, ROSILYN HOUSTON, SHANE CLANTON, JAVIER HERNANDEZ, KIRK PRESLEY, CELIA NIEHAUS, JOE CARTEE, JIM HESLOP, ANGEL REGLERO, individually and as members of the Investment Committee, ENVESTNET ASSET MANAGEMENT, INC. as investment fiduciary, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No._____ |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Christine D. Drake, individually and as representative of a class

of participants in and beneficiaries of the Compass SmartInvestor 401(k) Plan

(the "Plan"), pursuant to 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), states her

Complaint against Defendant BBVA Compass Bancshares, Inc. ("BBVA"),[1] as

---

[1] Reference is hereby made to the Form 5500 Reports filed by the Plan with the U.S. Department of Labor for the plan years ending December 31, 2010 through December 31, 2019. BBVA has filed inconsistent documents with the U.S. Dept. of Labor naming both "BBVA Compass Bancshares, Inc." and "Compass Bancshares, Inc." as the plan sponsor.

plan sponsor, plan administrator and a named fiduciary; Rosilyn Houston, Shane Clanton, Javier Hernandez, Kirk Presley, Celia Niehaus, Joe Cartee, Jim Heslop, and Angel Reglero, individually and as members of the Plan's retirement committee (the "Committee"); and Envestnet Asset Management, Inc., f/k/a Prima Capital Management, Inc. ("Envestnet"), the Plan's investment advisor; for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001-1461. BBVA and the Retirement Committee are referred to herein collectively as "BBVA" or the "BBVA Defendants" and, together with Envestnet, as "Defendants."

## INTRODUCTION

1.     Defendants each had the fiduciary duty to act prudently and not waste the Plan participants' retirement savings. The Committee, acting on the advice and recommendations of Envestnet, failed in its duties from start to finish by (i) failing to replace the Plan's stable value fund, in violation of the Plan's stated investment policy and performance guidelines; (ii) making bad bets on mutual funds that incurred additional fees with unrealistic expectation of beating the market; (iii) failing to follow its own guidelines for monitoring the fees and the performance of investment options; and (iv) failing to

---

BBVA describes the same entity as BBVA USA Bancshares, Inc. in filings with the Alabama Secretary of State. All do business as "BBVA".

adequately disclose to participants the information they needed to make informed investment decisions.

2.      Plaintiff is not second-guessing any of Defendants' investment decisions in hindsight.  The information BBVA and Envestnet needed to make informed and prudent investment decisions was readily available when they made those decisions.  BBVA either did not follow a prudent process, or, worse, simply buried their heads in the sand in the face of mounting evidence that the Plan's investments did not meet BBVA's own performance guidelines. As a result, the Plan was stocked with overpriced and underperforming funds that needlessly wasted participants' retirement savings.

3.      Each dollar Defendants wasted was one less dollar in participants' accounts generating returns and building retirement savings.  These dollars compound over time, so each one matters greatly.  The Department of Labor, which oversees ERISA, estimates that over thirty-five years, a 1% increase in fees and expenses can reduce a participant's account balance by 28%.[2]  Here, for the period beginning July 17, 2013 and ending December 28, 2020 (the "Class Period"), Plan participants lost an estimated **$42 to $67 million**, for which Defendants are liable.

---

[2]  *See* U.S. Dept. of Labor, *A Look at 410(k) Plan Fees*, 1-2 (Aug. 2013), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-a t-401k-plan-fees.pdf.

## JURISDICTION AND VENUE

4.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

5.     This District and Division are the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district and division in which the Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found.

## PARTIES, PARTIES-IN-INTEREST AND STANDING

6.     The Plan is a defined contribution, individual account, employee benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34).  The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a).  As of December 31, 2019, the Plan had more than $1.12 billion in assets and 15,000 participants with account balances.

7.     The Plan provides for the retirement savings and income of employees of BBVA.  The retirement savings and income of the employees participating in the Plan depend upon contributions made by or on behalf of each employee, deferrals of employee compensation and employer matching contributions, and on the performance of investment options net of the investment management fees and administrative expenses charged to the participants' individual accounts.

8.    Defendant BBVA, an Alabama corporation domiciled in Alabama, is the Plan Administrator under 29 U.S.C. § 1002 (16)(A)(i) and is a named fiduciary under the Plan and 29 U.S.C. § 1102(a).

9.    Defendants Rosilyn Houston, Shane Clanton, Javier Hernandez, Kirk Presley, Celia Niehaus, Joe Cartee, Jim Heslop, and Angel Reglero, were fiduciaries to the Plan that served as members of the Plan's Retirement Committee.

10.    Defendant Envestnet, a Delaware corporation headquartered in Chicago, Illinois, was the Plan's ERISA 3(21) investment advisor.

11.    Non-party Fidelity Management Trust Company ("FMTC") holds the assets of the Plan, as trustee, in accordance with 29 U.S.C. § 1103.  FMTC affiliate and non-party Fidelity Investments Institutional provided record-keeping services and maintained the Plan's investment platform.[3]  FMTC and Fidelity Investments Institutional, collectively, are referred to as "Fidelity").  Fidelity is a party-in-interest to the Plan whose compensation BBVA had a duty to monitor under ERISA § 408(b)(2).

12.    Plaintiff Barbara Christine D. Drake resides in Aubrey, Texas and was a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period because she and her beneficiaries were eligible to receive benefits under the Plan.  Plaintiff paid administrative expenses directly through fees deducted

---

[3] An investment platform is an online service that allows investors to access their account information and manage their investments.

from her account balance and indirectly through amounts included in the expense ratios of her investment options.

13.     Plaintiff was invested in each of the large-cap, mid-cap, small-cap, international, and fixed-income asset classes which are the subject of this Complaint.

14.     Plaintiff has both constitutional and statutory standing.  As to constitutional standing (or, "Article III standing"), Plaintiff alleges that she personally suffered concrete and particularized injuries.  Plaintiff was invested in the challenged funds during the class period and paid excessive fees. That confers constitutional standing.  ERISA § 502(a)(2) confers standing, as a matter of law, on "a participant, beneficiary or fiduciary" to seek relief under ERISA § 409.  Claims pursuant to ERISA § 409(a) are brought in a representative capacity on behalf of the plan.  Plaintiff has standing to bring claims individually and in a representative capacity on behalf of the Plan and the participants in the Plan.

## BBVA'S FIDUCIARY DUTIES

15.     Defined contribution plans such as the BBVA Plan have become America's primary means of saving for retirement.  This is the result of a gradual shift from traditional, defined benefit "pension" plans to defined contribution plans.  The United States Supreme Court explained the difference in *Thole v. U.S. Bank*:

> [i]n a defined-benefit plan, retirees receive a fixed payment each
> month, and the payments do not fluctuate with the value of the

plan or because of the plan fiduciaries' good or bad investment decisions.  By contrast, in a defined-contribution plan, such as a 401(k) or 403(b) plan, the retirees' benefits are typically tied to the value of their accounts, and the benefits can turn on the plan fiduciaries' particular investment decisions.

__ U.S. __, __, 140 S. Ct. 1615, 1618 (2020).  Thus, in a defined contribution plan, the participants – and not their employer – bear the risk and consequences of imprudent investment decisions.

16.     Employers also have the option to make participants responsible for paying both the Plan's investment and administrative expenses. Most employers, including BBVA, do this, which means that excessive fees resulting from the imprudent management of a retirement plan by the employer come out of participants' retirement savings.

17.     BBVA is the Plan Administrator and a Named Fiduciary under the plan instrument.  BBVA appointed the Retirement Committee to administer the Plan's investments and administrative expenses based upon the advice and recommendation of Envestnet.  BBVA, the Committee, and Envestnet all were fiduciaries to the Plan with responsibility for the Plan's investments and administrative expenses.

18.     BBVA acknowledged its duties in its Summary Plan Description stating: "The people who administer the plan, called 'fiduciaries' of the plan, have a duty to do so prudently and in the interests of all plan participants and beneficiaries."

## Fundamental Fiduciary Principles

19.     The duties owed by an ERISA fiduciary to plan participants are the "highest known to the law."  *See Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (*citing* RESTATEMENT (SECOND) OF TRUSTS § 2, cmt b (1959)).

20.     Under ERISA's statutory standard of care a plan fiduciary must:

> discharge his duties . . . solely in the interest of the participants and beneficiaries and
>
> (A) for the exclusive purpose of: (i)   providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

29 U.S.C. § 1104 (emphasis added).

21.     The fiduciary duties imposed by ERISA are "derived from the law of trusts" and "[i]n determining the contours of an ERISA's fiduciary's duty, courts often must look to the law of trusts."  *Tibble v. Edison Int'l*, 575 U.S. __, __, 135 S. Ct. 1823, 1828 (2015) (internal citations omitted).   In particular, the Supreme Court has instructed lower courts to look to the RESTATEMENT (THIRD) OF TRUSTS § 90 (2007), the UNIFORM PRUDENT INVESTOR ACT (1995) ("UPIA"), and leading treatises, among other authorities. *Id.*

22.     The UPIA summarizes a key aspect of fiduciary duty plainly: "Wasting beneficiaries' money is imprudent."  UPIA at § 7 *cmt*

23.    Whether an ERISA fiduciary meets its obligations is primarily a question of process and methodology: "ERISA requires fiduciaries to employ appropriate methods to investigate the merits of the investment and to structure the investment as well as to engage in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 358 (4th Cir. 2014) (internal punctuation and citation omitted).

### Specific Fiduciary Duties

24.    ***The duty of competence:***  A principal duty of an ERISA fiduciary is to be competent.  *See* 29 U.S.C. § 1104 (a fiduciary shall discharge his duties with "care, skill, prudence, and diligence"). "A trustee's lack of familiarity with investments is no excuse: under an objective standard trustees are to be judged according to the standards of others 'acting in a like capacity and familiar with such matters.'" *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (applying ERISA).  Where the trustee lacks the requisite knowledge and experience, the trustee may engage professional advisors.  *See, e.g.,* RESTATEMENT (THIRD) OF TRUSTS § 90 cmt d ("General requirements of care and skill").

25.    ***The continuing duty to monitor investments and to remove or replace imprudent investments:***  The United States Supreme Court held in *Tibble*: "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones . . . separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." __

U.S. __, __, 135 S. Ct. at 1828.  "The trustee must systematically consider all the investments of the trust at regular intervals to ensure that they are appropriate." *Id.*

26.  ***The duty to justify high-cost active management strategies:*** "Active investment management" and similar terms refer to investment strategies that try to beat the market.  Prudent investment principles allow for active management strategies in appropriate circumstances, but such strategies typically entail additional risks and costs that "must be justified by realistically evaluated return expectations."  RESTATEMENT (THIRD) OF TRUSTS § 90 at cmt h(2) ("Active strategies"); *see also id.* at cmt f ("A trustee's approach to investing must be reasonably supported in concept and must be implemented with proper care, skill and caution.").  Accordingly, in deciding whether to pursue an active management strategy, investment fiduciaries should determine that "gains from the course of action in question can reasonably be expected to compensate for its additional costs and risks."  *Id.* at cmt (h)(2).

27.  ***The duty to delegate to competent professionals:*** Plan sponsors often hire investment advisors to advise them on investment strategy and to recommend funds (here, BBVA hired Envestnet).  When a plan sponsor chooses to engage an advisor and pursue an active management strategy, the sponsor must determine "there is a credible basis for concluding that [the advisor] possesses or has access to the competence necessary to carry out the program and, when delegation is involved, that its terms and supervision are

appropriate." RESTATEMENT (THIRD) OF TRUSTS § 90, cmt h(2).

28.   ***The duty to defray reasonable administrative expenses:***   The day-to-day operation of an ERISA plan requires certain basic and necessary administrative functions, such as recordkeeping and accounting, and other discretionary services, such as providing customer service representatives, online account management, and educational programs.[4]  The fees charged by investment advisors are also a component of administrative expenses.  ERISA specifically requires a plan sponsor to "defray[ ] reasonable expenses of administering the plan . . . ."  29 U.S.C. § 1104(A)(ii).   The UPIA provides, "[i]n investing and managing trust assets, a trustee may only incur costs that are appropriate and reasonable . . . .  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  UPIA at § 7 cmt

29.   ***The duty to disclose material information to participants:***   In addition to the statutory duty to provide certain documents to plan participants upon request, plan administrators have a duty to disclose material information respecting participants' investments.  The Eleventh Circuit held, in *Jones v. Am. General Life and Acc. Ins. Co.*, "an ERISA participant has a right to accurate information, and [] an ERISA administrator's withholding of information may give rise to a cause of action for breach of fiduciary duty."[5]

---

[4] *A Look at 401(k) Plan Fees*, at 3.

[5] 370 F.3d 1065, 1072 (11th Cir. 2004) (collecting cases).  *See also Brannen v. First Citizen Bancshares Inc. ESOP Plan*, No. 6:15-cv-30 (S.D. Ga. Aug. 26, 2016), at 20 ("Courts have concluded that ERISA plan participants may state a cause of action for breach of

## Liability of Fiduciaries

30.     A plan fiduciary that breaches any of the obligations imposed by ERISA is liable to make the plan whole for all losses resulting from the breach, and an individual who breaches their fiduciary duties is *personally liable* for such losses.  *See* ERISA § 409.

31.     Under ERISA, losses are measured according to "the 'total return' measure of loss and damages for breach of trust."  *See Brotherston v. Putnam Invs., L.L.C.*, 907 F.3d 17, 31 (1st Cir. 2018) (citing Restatement (Third) Trusts § 100).  Thus, the recoverable loss is the amount necessary to restore to the plan to the value it would have had if the plan's assets had been properly administered.  *Id. See also Bierwirth*, 754 F.2d at 1057 ("The question of loss to the Plan . . . requires a comparison between the actual performance of the Plan and the performance that otherwise would have taken place.").

32.     In an excessive fee case such as this, the resulting loss includes both the amount of the excessive fees and the investment returns participants would have earned had these funds been properly invested.

---

fiduciary duty based on a failure to disclose information to plan participants" though they are "reluctant to require disclosure in cases based on inside information."). Plaintiffs do not allege that BBVA withheld non-public, "inside," information.  Rather, Plaintiffs allege BBVA failed to disclose the excessive fees being charged participants, as well as its own imprudent practices and methodology in administering the Plan.

## THE PLAN AND ITS INVESMENTS

33.     The Plan is structured as a cafeteria type plan in which participants chose from investment options selected and maintained by BBVA.  Participants could choose the asset classes[6] in which they were invested but had no control over the cost or performance of the funds selected by BBVA within each asset class.  This was a "cafeteria" plan in which BBVA set the menu.  Participants were captive investors whose choices within each asset class were limited by the investment decisions made by BBVA.  The value of their individual accounts depended in large measure upon the decisions the Committee, acting on the advice and recommendations of Envestnet, made as investment fiduciary to the Plan.

### Envestnet

34.     Envestnet was the architect of BBVA's investment strategy.[7]  The scope of Envestnet's services included: (i) the design, evaluation and review of investment policies, objectives, and guidelines; (ii) recommending and monitoring of the Plan's investment options; and, (iii) monitoring the Plan's investment options and recommending of changes to the Committee on a quarterly basis.

---

[6] An "asset class" is a grouping of similar investment vehicles; for example, equities (stocks), fixed income (bonds) or cash.  Equities are often sub-divided according to market capitalization (small-cap, mid-cap, or large cap), or other criteria.

[7] BBVA engaged Prima Capital Management, Inc., as its fiduciary investment advisor, in 2005.  Prima was acquired by Envestnet in 2012 and continued to do business as "Envestnet/PMC."

35.     Envestnet, as an ERISA 3(21) fiduciary advisor to the Plan, gave advice and made recommendations to the Committee on the selection, monitoring, removal and replacement of the investment options from the beginning of the Class Period until BBVA terminated Envestnet's contract when the Committee recognized that its investment strategy had failed.  BBVA hired Willis Towers Watson plc ("Willis Towers") to replace Envestnet. The Committee, on Willis Towers' advice, made wholesale changes to its investment strategy, including replacing the high-fee, actively managed funds with low-fee index funds.  BBVA's actions constitute an admission of the truth of most of the allegations of this Complaint.

## BBVA's Statement of Investment Policy

36.     BBVA's investment objectives, guidelines and performance standards for the Plan's investments were described in a formal, written Statement of Investment Policy ("SIP") dated September 19, 2008.  The SIP was signed by Envestnet and each member of the Committee.

37.     The SIP stated that the responsibilities of the Committee included "[d]eveloping an investment program that offers a diversified range of funds" and "[i]dentifying investment options (i.e., types of funds) which it deems appropriate and prudent to make available to plan participants . . . ."

38.     The SIP also required BBVA to monitor the Plan's investments to verify that they satisfied BBVA's performance standards, that investment managers were delivering competitive returns, and that the manager's fees

and expense ratios[8] were reasonable.

39.     The SIP stated that "the primary investment objectives" of the Plan included offering a menu of investment options such that, among other objectives: (i) "[s]ufficient options are offered to allow participants to build portfolios consistent with their investment risk/return," and (ii) "[e]ach option is adequately diversified . . . ."

40.     The SIP for the Plan established the following asset classes of investments: (i) Money Market; (ii) Stable Value; (iii) Fixed Income ("core bond"); (iv) Domestic Large Capitalization Value Equity ("large-cap value"); (v) Domestic Large Capitalization Growth Equity ("large-cap growth"); (vi) Domestic Large Capitalization Equity Index ("large-cap"); (vii) Domestic Mid Capitalization Equity ("mid-cap"); (viii) Domestic Small Capitalization ("small-cap"); (ix) International Equity ("international stock"); and, (x) company stock.

41.     **Schedule A** to the Appendix to this Complaint describes the investment options for the Plan in detail. Specifically, **Schedule A** lists (i) each fund offered by the Plan, (ii) that fund's average annual expense ratio ("ER") and (iii) its designated benchmark index.[9]   The schedule then lists (iv) the

---

[8] An "expense ratio" is the total of all of a mutual fund's operating expenses, expressed as a percentage of fund assets, which are deducted from returns.

[9] In most cases the appropriate benchmark index is the primary index designated by the fund manager.  Sometimes, a different index is more appropriate, as where the style of the fund has changed (e.g., from international core to international growth) and the fund manager's secondary designated benchmark more closely matches the style of the fund.

corresponding Vanguard index fund benchmark and (v) its average annual expense ratio.

42.    The SIP also required BBVA to monitor each of these investments to verify that the fees were reasonable and that they satisfied BBVA's performance standards.

## THE STABLE VALUE OPTION

43.    At the beginning of the Class Period, consistent with the SIP requirements, the Plan offered three fixed income options: (i) a money market fund (initially, from Goldman Sachs, later from Vanguard); (ii) a stable value fund, the SEI Stable Asset Fund, and (iii) a "core bond" product.[10]  The SIP describes the purpose, benchmarks, and peer groups for these funds in detail.

44.    Money market funds are the checking accounts of retirement plans.  They invest in securities with ultra-short durations of approximately 60 days.  The funds are liquid, but interest rates are low.

45.    Core bond funds are longer term investments. The Plan's core bond fixed income fund invested in securities with a duration of approximately 5 years.  Bond funds invest in securities of longer duration than money

---

[10] The core bond asset class is labelled "fixed income" in the SIP. The term core bond is synonymous with exposure to the securities that constitute the Bloomberg Barclays U.S. Aggregate Bond Index. For purposes of clarity, the "fixed income" asset class defined by the SIP will be referred to as the core bond asset class, to distinguish the core bond fund from stable value, money market, and other fixed income asset classes.

market funds and have greater expected returns, but are more sensitive to interest rates.  The returns vary and may even be negative for short periods of time of time.

46.     Stable value funds are the middle ground.  Stable value funds typically invest in securities with a duration of approximately 3 years. The expected returns are superior to those of money market funds, but are less volatile than core bond funds.

**BBVA Imprudently Failed To
Replace The Stable Value Fund**

47.     Prior to 2011, the stable value option for the Plan was the SEI Stable Asset Fund.

48.     Plan participants had chosen to put some $100 million of their retirement savings in the SEI fund.

49.     The SEI fund did not perform well during the financial crisis, and SEI decided to wind the fund down and distribute its assets to the fund's retirement plan investors.  The process of winding down the fund took approximately 12 months.

50.     A prudent plan sponsor would have secured an appropriate replacement for the shuttered SEI fund, whether in the form of another stable value fund or even a short-term bond option or options. Indeed, numerous re-

tirement plans that had invested in the SEI stable value fund had little diffi-culty finding replacements.[11]  Suitable high-quality products were available from any number of providers.

51.    The following chart shows the 2011-2018 returns of a few readily available alternatives:

*Figure 1:*    *Cumulative Returns of Stable Value and Short-Term Bond Funds*



_____

[11] This allegation is based on information about how other plan sponsors reacted to the winding down of the SEI stable value fund.

52.    The chart shows the returns for short- and medium-term bond funds available from Vanguard[12] and also the Hueler Stable Value Index (an equal weighted average of reporting stable value funds).[13]

53.    BBVA did not select a new stable value fund or any other similar product as it should have in order to comply with the terms of the SIP, including the requirements that the Plan include sufficient and diverse options to satisfy participants' investment goals.

54.    Instead, as SEI liquidated the stable value fund, BBVA deposited the proceeds into the Plan's existing money market account.  The returns for the money market fund, which was the *only* remaining short-term option available on the Plan menu, are represented by the bottom line on the above chart (***Figure 1***), the fund with the lowest returns.

55.    The money market account was not a reasonable, prudent replacement for the stable value fund.

56.    BBVA may not have been competent, however, to recognize the imprudence of its decision.  BBVA and Envestnet apparently had evaluated the performance of the SEI stable value fund by reference to a 3-month treasury bill benchmark.  That is not an appropriate benchmark for stable value funds

---

[12] Vanguard Retirement Group ("Vanguard) was and remains the world's largest provider of mutual funds.

[13] Stable value funds, represented by the index, were readily available from any number of reputable providers.

(which invest in securities with an approximate duration of three years) and had the effect of understating the fund's expected returns.  Having miscalculated the expected return of the SEI fund to be lower than it actually was, BBVA may not have even realized that a low-yield money market fund was not a reasonable replacement.[14]

### BBVA "Stuffed Cash in a Mattress"

57.    ERISA retirement plans are intended both to preserve principal and to generate income.  Trustees have an obligation to generate income from trust assets and may not hoard cash in the name of capital preservation.  As the First Circuit Court of Appeals observed in *Brotherston*, "a trustee who decides to stuff cash in a mattress cannot assure that there is no loss merely by holding onto the mattress."  907 F.3d at 31.

58.    BBVA's decision to put $100 million of participants' retirement savings in the Plan's money market fund was essentially the same as stuffing cash in a mattress.  The money market fund earned little to no interest over the Class Period.  Had BBVA selected a suitable replacement for the stable

---

[14] BBVA was explicitly made aware of the consequences of its failure to replace the stable value fund in 2016, when it conducted a search to replace its investment advisor. Mercer, one of the investment advisors from which BBVA solicited proposals, told BBVA that it needed to find a better replacement for the stable value fund. BBVA almost certainly realized its error earlier, however. In 2014, rather than fix the problem, BBVA amended its SIP to simply delete the requirement that the Plan offer a stable value product. Pretending that it never needed a stable value fund anyway does not cure BBVA's imprudence in failing to identify a suitable replacement for the SEI fund.

value fund – as the SIP required and a prudent fiduciary would have done – participants would have earned millions of dollars in returns from the replacement fund instead of the small change generated by their money market accounts.

59.    Under the economic conditions prevailing during the Class Period, a period where ultra-short-term rates were at historic lows, using a money market fund as a replacement for a stable value fund was manifestly imprudent.  The returns on money market funds during that period were near zero.  Reliance on a money market fund to generate income in a low-interest rate environment was inconsistent with an investment fiduciary's duty to "produce income that is reasonably appropriate to the purposes of the trust and to the diverse present and future interests of its beneficiaries." Restatement (Third) of Trust § 79.

60.    Using a money market fund as the replacement for a stable value fund was also inconsistent with the requirements of the SIP.  With respect to the Plan's stable value asset class, the SIP states: "This portfolio will be invested in high-grade short term fixed income securities and cash equivalents, and/or well-diversified guaranteed investment contracts and bank deposit investment contracts of varying maturity, size and yield."  The money market fund did not satisfy these requirements.

61.    The SIP imposed specific requirements with regard to the monitoring of the stable value asset class: "The stable value option will also be

monitored for stability in return and average weighted quality of the portfolio."

62.   BBVA's decision to use the Plan's money market fund as a replacement for a stable value fund breached its continuing fiduciary duty to monitor investment options.  In *Tibble*, the United States Supreme Court unanimously held that, "Under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones . . . separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset."  135 S. Ct. at 1828.  "The trustee must systematically consider all the investments of the trust at regular intervals to ensure that they are appropriate." *Id.*

63.   A fiduciary that monitored the performance of the Plan would have been aware that the money market fund was not suitable as a substitute for a stable value fund.  The (asset-weighted) duration of the Vanguard Money Market Fund's holdings was 60 days or less, with returns of near zero.  A money market fund, even a good one, is not a substitute for a stable value fund holding securities of an average duration of 3 years and offering higher returns.  They are different investment products and serve different investment purposes.

64.   For the six years preceding the filing of this lawsuit, the Plan's money market funds returned 0.01% or less per year, close to nothing.  Indeed, accounting for inflation, participants invested in the market option actually

lost money.  The participants in the Plan, deprived of an appropriate replacement for the stable value funds, were forced to place their retirement savings in the Plan's mattress.

### Participants Suffer A Substantial Loss

65.    Plan participants lost millions of dollars as a result of BBVA's failure to replace the stable value fund.  *Figure 2* compares the returns of the Plan's money market fund to the most widely used stable value benchmark:

*Figure 2.*    *Calendar Year Returns of BBVA Money Market Fund and Benchmark (in percent)*



| | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|---|---|---|---|---|---|
| **Money Market Fund** | 0.14% | 0.11 | 0.06 | 0.05 | 0.11 | 0.55 | 1.08 | 2.01 | 2.29 | 0.98 |
| **Hueler Index** | 2.69% | 2.26 | 1.84 | 1.69 | 1.77 | 1.79 | 1.96 | 2.23 | 2.45 | 2.31 |
| **Difference** | -2.55% | -2.15 | -1.78 | -1.64 | -1.66 | -1.24 | -0.88 | -0.22 | -0.16 | -1.33 |

23

66.    As shown in *Figure 2* above, year after year during a period of economic recession, returns from stable value products were significantly higher than those of the Plan's money market fund.

67.    The dollar loss attributable to the difference in returns is illustrated in *Figure 3*:

*Figure 3:* *Loss in Money Market / Stable Value Asset Class*

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **Difference (in %)** | -1.78 | -1.64 | -1.66 | -1.24 | -0.88 | -0.22 | -0.16 | -1.33 | |
| **MM Assets (in $ US Millions)** | 121.6 | 108.7 | 97.7 | 101.4 | 87.5 | 104.0 | 115.4 | 115.4 | |
| **Loss (in $ US Millions)** | **-2.17** | **-1.78** | **-1.62** | **-1.26** | **-0.77** | **-0.23** | **-0.18** | **-1.53** | **-9.55 $ US Million** |

The resulting loss suffered by participants, before compounding, is approximately *$9.55 million* through the end of 2020 and continues to accrue.

**BBVA'S FAILED ACTIVELY MANAGED STRATEGY**

68.    With the exception company stock and the stable value fund,[15] the investment options for each of the Plan's asset classes were mutual funds.[16] The fees charged by the mutual funds were asset-based, i.e., a percentage fee

---

[15] A stable value fund is a capital preservation investment vehicle typically composed of high quality, low risk investments paying a guaranteed interest rate.  The stable value fund at issue is the Transamerica pooled separate account stable value fund (the "SAGIC").  The Plan also had a Transamerica general account ("GIC") stable value fund, which functioned as a cash management account, not as an investment vehicle.

[16] A mutual fund is a managed investment fund that pools money from investors to purchase securities.

based on the fund's total assets.  The fees were deducted from investment re-turns.  Save for a small handful of exceptions, the investment options in each of the Plan's asset classes consisted of actively managed mutual funds.

69.    BBVA relied primarily on actively managed funds in the hope of generating "excess returns" – i.e., returns exceeding those of low-cost index funds invested in the same asset class.  In fact, in the SIP, BBVA took the extraordinary step of requiring that actively-managed funds be used for most of the asset classes. This meant that not only were actively-managed funds permitted but index funds were *excluded*.  This was a calamity.  Many of the asset classes for which actively managed funds were required were, in fact, asset classes in which actively-managed funds as a group were known to underperform index funds.

70.    In deciding whether to pursue an expensive and risky active management strategy, BBVA was obligated, first, to determine that "gains from the course of action in question [could] reasonably be expected to compensate for its additional costs and risks."  RESTATEMENT (THIRD) TRUSTS § 90 at cmt (h)(2).  Thus, BBVA's actively managed investment strategies were justified only if it had realistic expectations of returns sufficient to cover the substantial additional costs and risks of the strategy.  Second, BBVA also had to determine that the fund managers implementing the active management strategies had "the competence necessary to carry out [the strategies]."  *Id*.

## The Actively Managed Strategies Were A Risky Bet

71.    While it is not imprudent *per se* to pursue an active management investment strategy, the clear consensus is that, in efficient markets, active management is a high risk strategy:  "fiduciaries and other investors are confronted with potent evidence that . . . efforts to 'beat the market' . . . ordinarily promises little or no payoff, in fact, often a negative payoff . . . ."  RESTATEMENT (THIRD) TRUSTS § 90 at Reporter's General Comments.

72.    Readily available empirical data demonstrates that, over time and across market sectors, the substantial majority of actively managed funds consistently fail to outperform the market.

73.    Research by S&P Global (formerly, Standard and Poor's) published under the "SPIVA" mark (S&P Indices Versus Active) shows that, as of December 31, 2019, 71% of actively managed U.S. large-cap funds underperformed the S&P 500 index annually and more than 90% underperformed over the prior 15 year period.[17]  Those numbers reflect fund performance on an aggregated basis; the results for individual funds are worse.  S&P Global reports that of the top half of domestic equity funds in 2015, only 3.84% maintained that status annually through 2019, significantly below what random chance would predict.  Of the top quarter of those funds in 2015, a mere 0.18% maintained that

---

[17] https://www.spindices.com/spiva/#/reports/regions. This is the most recent available data. The last full year of data is for the period ending December 31, 2019.

performance over the next four years, again below random chance.[18]

74.    The vast majority of active managers fail to consistently generate excess returns sufficient to cover their additional investment management and transaction costs.  As S&P Global reports,

> SPIVA research tells us that relatively few active managers are able to outperform passive managers over any given time period, either short-term or long-term. But the true measure of successful active management is whether a manager or strategy can deliver above-average returns consistently over multiple periods. Demonstrating the ability to outperform repeatedly is the only proven way to differentiate a manager's skill from luck. Through research published in our Persistence Scorecards, we show that relatively few funds can consistently stay at the top.[19]

75.    There are systemic reasons why so few investment managers are able to outperform the major U.S. capital markets with any consistency. Active management relies on exploiting market inefficiencies (e.g., identifying an under-valued stock), but the major capital markets in which most mutual funds invest are highly efficient.   There are few, if any, inefficiencies to exploit.  As explained in the RESTATEMENT (THIRD) OF TRUSTS § 90:

> Economic evidence shows that, from a typical investment perspective, the major capital markets of this country are highly efficient, in the sense that available information is rapidly digested and reflected in the market prices of securities.  As a result, fiduciaries and other investors are confronted with potent evidence that the application of expertise, investigation, and diligence in **efforts to "beat the market" in these publicly traded securities ordinarily promises little or no payoff**, in fact, often a negative

---

[18] *Id.* (at "Persistence Scorecard" tab).

[19] https://www.spindices.com/spiva/#/reports/regions.

payoff after taking account of research and transaction costs. Empirical research supporting the theory of efficient markets reveals that in such markets skilled professionals have rarely been able to identify underpriced securities (that is, to outguess the market with respect to future return) with any regularity.  In fact, evidence shows that **there is little correlation between fund managers' earlier successes and their ability to produce above-market returns in subsequent periods.**

Reporter's General Note on Comments e through h: Introduction to Portfolio Theory and Other Investment Concepts (emphasis added).

76.    Thus, the Restatement notes, "[c]urrent assessments of the degree of efficiency support the adoption of various forms of passive strategies by trustees, such as reliance on index funds."  *Id.*

### The Markets In Which BBVA Invested Were Efficient

77.    S&P Global data (*see **Schedules B.1 and B.2***) show that, both before and during the Class Period, active managers of funds in the largely efficient asset classes in which BBVA invested consistently underperformed their own chosen benchmarks.  ***Schedule B.1*** compares, year by year, the performance of actively-managed funds to their passively-managed counterparts (represented by the index). ***Schedule B.2*** shows the performance over one- to fifteen-year periods as of December 31, 2019. As is readily apparent from ***Schedules B.1 and B.2***, while some active fund managers in some asset classes will sometimes outperform their benchmarks, the large majority fail (*see **Schedule B.2.***, "Percentage Underperforming" column).  Only a very few are consistently successful.  As Warren Buffet observed in a 2014 letter to shareholders, "There are a few investment managers, of course, who are very

good – though in the short run, it's difficult to determine whether a great record is due to luck or talent. Most advisors, however, are far better at generating high fees than they are at generating high returns. In truth, their core competence is salesmanship."[20] Faced with this data, BBVA should have proceed with great caution, knowing that pursuing an active management was a high stakes, low-percentage bet.

### A Prudent Plan Sponsor Would Have Considered Less-Expensive Investments

78.     All investment managers charge fees for their services and, as the Department of Labor reports, investment management fees are "by far the largest component" of all ERISA plan fees and expenses.[21] Moreover, actively managed funds typically charge higher fees than passively managed funds:

> [f]unds that are 'actively managed' (*i.e.*, funds with an investment advisor who continually researches, monitors, and actively trades the holdings of the fund to seek a higher return than the market) generally have higher fees . . . .  While actively managed funds seek to provide higher returns than the market, neither active management nor higher fees necessarily guarantee higher returns.  Funds that are 'passively managed' generally have lower management fees.  Passively managed funds seek to obtain the investment result of an established market index, such as the Standard and Poor's 500, by duplicating the holdings included in the index.[22]

---

[20] Warren Buffett, *2014 - Berkshire Hathaway Shareholder Letter*, p. 19.

[21] *See* "A Look at 401(k) Plan Fees," *supra*.

[22] *Id.*

79.     Index funds comparable to each of the Plan's funds were readily available from Vanguard and other reputable providers and would have been given careful consideration by a prudent sponsor.

80.     Index funds allow investment in efficient broad markets without incurring unnecessary fees.  The average cost of an index fund for an institutional investor is about 15 basis points (bps),[23] returning 99.85% of the market returns to the investor.  Index funds in the most efficient asset classes, such as large-cap U.S. stocks, are priced as low as 2 bps, returning 99.98% to investors.  These cost-efficient investments are available from any number of reputable providers, including Vanguard, TIAA-CREF, Fidelity, Schwab, and others.

81.     The index fund approach to investing and controlling costs is fundamentally sound from a trust law perspective.  *See* RESTATEMENT (THIRD) OF TRUSTS at Reporter's General Note on Comments e through h (research supports the use of passive strategies such as index funds); *see also id.* at § 90, cmt h(1) ("Investing in index funds that track major stock exchanges or widely published listings of publicly traded stocks is illustrative of an essentially passive but practical investment alternative to be considered by trustees seeking to include corporate equity in their portfolios.").

---

[23] In these competitive markets, fees are measured in basis points, 1/100th of a percent, and every basis point matters.

## The Best Tool For Understanding The Costs
## Of Investment Management: Expense Ratios

82.     To determine whether reasonably expected returns justified the costs of its active management strategy, BBVA had to know what those costs were.  The best tool for knowing that was the "expense ratio" of the funds in which it was investing.  Further, expense ratios are strong predictors of performance.

83.     Mutual funds are regulated by the U.S. Securities and Exchange Commission (the "SEC").  The SEC requires mutual funds to designate a broad market index (e.g., the S&P 500 Index or the Russell 1000 Growth Index)[24] against which the fund's returns may be measured, and to disclose certain of the fund's fees and expenses, which is reported as an expense ratio.

84.     A mutual fund's expense ratio is disclosed as part of its "Annual Fund Operating Expenses" as a percentage of assets.  In order to manage operating expenses, a plan sponsor must understand and continually evaluate the expenses, fees and service providers associated with the plan's investments.  The U.S. Department of Labor advises that:

> As the sponsor of a retirement plan . . . you, or someone you appoint, will be responsible for making important decisions about the plan's management. Your decision-making will include selecting plan investments or investment options and plan service providers.  Many of your decisions will require you to understand and evaluate the costs to the plan. . . .  Among other duties, fiduciaries

---

[24]  An index tracks the performance of a group of assets in a standardized way.  A stock market index is a hypothetical basket of securities that measures the performance of a market sector and is used to compare the returns generated by mutual funds.

have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable. . . .  As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing.[25]

85.    The leading mutual fund investment research and services firm, Morningstar, emphasizes the effect of expenses on fund performance and advises investors to rely on expense ratios when choosing mutual funds:

If there's anything in the whole world of mutual funds that you can take to the bank, it's that expense ratios help you make a better decision.  In every single time period and data point tested, low-cost funds beat high-cost funds. . . . Expense ratios are strong predictors of performance. . . .  Investors should make expense ratios a primary test in fund selection.  They are still the most dependable predictor of performance.[26]

### BBVA Ignored A Bright Red Flag: High Expense Ratios

86.    The average annual expense ratios for the Plan's funds were four and a half times higher than the average expense ratios for lower-cost index funds invested in the very same asset classes.  This information was readily available to BBVA, without the benefit of hindsight.

---

[25] U.S. Department of Labor, Employee Benefits Security Administration, *Understanding Retirement Plan Fees and Expenses*, at 1-2 (Dec. 2011), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf

[26] Morningstar, Russell Kinnel, *How Expense Ratios and Star Ratings Predict Success*, Aug. 9, 2010, https://www.morningstar.com/articles/347327/how-expense-ratios-and-star-ratings-predict-success (emphasis added).

87.    If either before or during the Class Period, BBVA had compared the expense ratios of the Plan's funds to the expense ratios of corresponding benchmark funds,[27] it would have known how excessive the fees and expenses for the Plans' funds were.

88.    The average expense ratios of the Plan's funds from the beginning of the Class Period comparted to the average expense ratios of low-cost Vanguard alternatives in the same asset class are:

---

[27] As noted above, a market index is a hypothetical basket of securities. An index fund benchmark is a "real-world" fund that invests in the securities that make up the market index. Thus, the hypothetical market index returns and the real-world index fund returns are based on the performance of the same securities. Market index returns do not take fees and costs into account. Index fund returns, on the other hand, include fees and costs. Thus, index fund benchmarks are appropriate benchmark for the comparison and evaluation of a mutual fund's returns net of fees.

**Figure 4:**   *Average Expense Ratios of Plan and Vanguard Bench-marks at the Beginning of the Class Period*

| BBVA Fund | Avg Ann ER (in %) | Benchmark Fund | Avg Ann ER (in %) |
|---|---|---|---|
| **TARGET DATE** | | | |
| Principal Lifetime 2015 | 0.69 | Vanguard Target Retirement 2015 | 0.16 |
| Principal Lifetime 2020 | 0.71 | Vanguard Target Retirement 2020 | 0.16 |
| Principal Lifetime 2025 | 0.73 | Vanguard Target Retirement 2025 | 0.17 |
| Principal Lifetime 2030 | 0.75 | Vanguard Target Retirement 2030 | 0.17 |
| Principal Lifetime 2035 | 0.76 | Vanguard Target Retirement 2035 | 0.17 |
| Principal Lifetime 2040 | 0.77 | Vanguard Target Retirement 2040 | 0.18 |
| Principal Lifetime 2045 | 0.79 | Vanguard Target Retirement 2045 | 0.18 |
| Principal Lifetime 2050 | 0.83 | Vanguard Target Retirement 2050 | 0.18 |
| Principal Lifetime 2055 | 0.78 | Vanguard Target Retirement 2055 | 0.18 |
| Principal Lifetime Strategic Inc | 0.63 | Vanguard Equity-Income | 0.29 |
| **EQUITY** | | | |
| **Large Cap** | | | |
| Vanguard Institutional Index | 0.04 | Vanguard Institutional Plus Index Fund | 0.02 |
| Dodge & Cox Stock | 0.52 | Vanguard Mega Cap Value Index Institutional | 0.07 |
| Harbor Funds Cap Appreciation | 0.66 | Vanguard Russell 1000 Growth Index I | 0.07 |
| **Mid Cap** | | | |
| JP Morgan Mid Cap Growth | 0.74 | Vanguard Mid-Cap Growth Index Fund | 0.08 |
| Principal Mid Cap Value | 0.91 | Vanguard Mid-Cap Value Index | 0.08 |
| **Small Cap** | | | |
| Aston/TAMRO Small Cap | 1.05 | Vanguard Small Cap Growth | 0.09 |
| **International** | | | |
| Thornburg International Value | 0.87 | Vanguard International Value | 0.42 |
| Invesco International Growth | 0.90 | Vanguard International Growth | 0.33 |
| **FIXED INCOME** | | | |
| Am Cen Div Bond | 0.40 | Vanguard Total Bond Market Index Fund Admiral | 0.17 |
| Stable Value Fund | - | - | - |
| Money Market Fund | - | - | - |
| **AVERAGE** | **0.73** | | **0.16** |

*Figure 4* compares the average annual expense ratios (ER) over the Class Period of the Plan's funds to the average annual expense ratios of corresponding Vanguard index fund benchmarks over the same period for the same asset classes.  The use of a Vanguard index fund to estimate the cost of investing in the designated broad market index without incurring substantial

additional fees is both reasonable and appropriate.[28]  On average, the Plan funds are four and a half times (0.73 versus 0.16) as expensive as Vanguard index fund alternatives.

89.   **Schedule A** of the Appendix compares the average annual expense ratios of the Plan funds with the expense ratios of the corresponding Vanguard index fund benchmarks over the entire Class Period.[29]  For each fund, the schedule shows the difference between the expense ratios of the Plan fund and the index fund benchmark ("excess").

90.   For example, the Plan's "Principal LifeTime 2040" fund had an expense ratio of 0.77% and the corresponding index fund benchmark has an expense ratio of 0.18%,[30] for a difference, or "excess" of 0.59% (this may also be reported in basis points. The "bottom line" of **Schedule A** shows that the average annual expense ratio for all funds in the Plan was 0.73% versus 0.16% for the benchmark funds, a difference of .57%.

---

[28]  *See* Eugene F. Fama and Kenneth R. French, *Luck Versus Skill in Mutual Fund Returns*, THE JOURNAL OF FINANCE 1933 (Oct. 2010).

[29]  Vanguard funds often are used as benchmarks for the cost of investing in an asset class in ERISA cases.  This is not because there is anything special about Vanguard funds. Vanguard is only one of any number of reputable, competitively priced index fund providers. But, because Vanguard is the largest index fund providers, Vanguard fund comparator products are readily available in the vast majority of the asset classes in which retirement plans are invested.

[30]  This is the retail share class of the Vanguard fund. The same fund was made available for institutions at a cost of 0.09%.

91.     **Figure 4** and **Schedule A** presents an apples-to-apples comparison of the cost of the Plan funds to their index fund benchmarks.  As illustrated, the actively managed funds selected by the Plan were 2 to 10 times as expensive as the comparable Vanguard fund benchmarks.

92.     Had BBVA simply compared the expense ratios of the Plan's funds with the expense ratios of the Vanguard index fund benchmarks, it would have known that it could have invested in essentially the same underlying assets simply by choosing low-cost Vanguard index funds (or similar index funds) and thereby saved the Plan participants millions of dollars.

93.     The largest part of the funds' excess costs were the investment management fees received by the managers of the Plan's actively-managed funds.

94.     The dollar cost to the Plan's participants of BBVA's decision to pursue an active investment strategy, compared to what the cost could have been to make essentially the same investment with Vanguard index funds, is shown in *Figure 5*:

***Figure 5.*** *Fees Chasing Excess Returns (estimate in $ US millions).*



| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|---|
| BBVA Funds | 3.4 | 3.6 | 3.9 | 3.7 | 3.0 | 2.7 | 3.3 | 23.6 |
| Benchmark | 0.8 | 0.9 | 0.8 | 0.8 | 0.9 | 0.9 | 1.1 | 6.2 |
| **Excess Fees** | **2.6** | **2.7** | **3.1** | **2.9** | **2.1** | **1.8** | **2.2** | **17.4  million** |

95.     As ***Figure 5*** shows, during the Class Period,[31] the active fund managers selected by BBVA charged approximately **$17.4 million** more in investment management fees than Vanguard would have to make essentially the same investments.

---

[31] The Class Period is defined as: from July 17, 2013 through the date of judgment; thus, Plaintiffs will update all damage calculations in due course.

96.    The additional investment management fees charged by the Plan's fund managers were not justified because, as shown below, the funds did not generate returns that compensated for the additional fees.

### Transaction Costs

97.    Actively managed funds also incur substantial additional transaction costs, including commissions, bid-ask spread, market impact costs and cash drag.  These costs are not included in the fund's expense ratio but do reduce the fund's returns.  Transaction costs are a function of trading; the more trading, the higher the costs.

98.    The SEC requires mutual funds to disclose their annual "turnover ratio," the percentage of the fund's holdings that have changed over the year. It is a measure of trading activity.  Turnover ratios vary widely but generally are between 0% and 100%.

99.    The turnover ratios of the funds in the Plan were high. *See* **Schedule C** of the Appendix.[32]

100.   While there is nothing inherently bad or imprudent in high turnover ratios, imprudent active management is not made better by doing it more actively.  It only increases transaction costs unnecessarily.  The high turnover ratio of the Plan funds thus reflects additional needless costs to participants.

---

[32] As discussed herein, the Principal Lifetime target date funds were fund-of-funds. The underlying funds in which they invested also had high turnover ratios. (*See* **Schedule E.4.**)

## Imprudent Fee Benchmarks

101.   The methodology BBVA used to benchmark the fees and expenses of its mutual fund options was not only imprudent but was almost guaranteed to fail.  BBVA should have benchmarked the cost of its investments to the cost of investments offered by other institutional providers.  BBVA instead compared the fees and expenses of the Plan's mutual funds to those of supposed "peer" groups that included retail investors, such as mom and pop businesses and individual investors that do not have access to low-cost institutional investments.  These artificial comparisons, based on information provided by Envestnet, allowed BBVA to pretend that its investments were less expensive than they really were.

102.   After six years of using the wrong benchmark to compare fees, BBVA terminated Envestnet's contract and hired a new advisor, Willis Towers. One of the new advisor's first changes was to benchmark the fees and expenses of the investment options more accurately.  This clearly showed that the Plan's investments were more expensive, relative to their proper peer group, than previously thought.  It quickly resulted in BBVA removing many of the higher cost investment options and substituting lower cost alternatives.

## Investment Vehicles

103.   Large plans such as the BBVA Plan have access to low-cost investment vehicles that are not available to individuals and smaller plans. These

include institutional class mutual funds and low-cost investment vehicles such as separately managed accounts and collective investment trusts ("CITs").  These investment vehicles allow a plan to reduce the investment expenses of implementing both active and passive investment strategies. Plans comparable to the BBVA Plan have used them to reduce costs.  BBVA was obligated to consider them, BBVA did not.

104.   In fact, BBVA not only failed to consider low-cost investment vehicles such as CITs and separately managed accounts, BBVA excluded them from consideration.  In 2013, the Committee and Envestnet,[33] without conducting any due diligence, chose to limit the investment vehicles for the Plan to mutual funds.  The 2008 SIP permitted investment in mutual funds, CITs, and separately managed accounts. The amendments to the 2014 SIP deleted CITs and separately managed accounts from the list of permissible investment options.

105.   The advantage to CITs and separately managed accounts is that, for large plans, they provide more cost-effective vehicles than mutual funds. For example, many of the best low-cost target date funds, such as the Vanguard target retirement trust, are CITs.  Many of the best stable value products are structured as CITs.  Many of the best active-management strategies can be implemented through separately managed accounts at a lower cost

---

[33] Although the 2014 Amendment was never signed, it was authorized by the Retirement Committee, on the advice of Envestnet.  The 2014 amendment has a signature block for each of the members of the Committee and "Envestnet/PMC."

than through mutual funds.  By arbitrarily excluding these investment vehicles, the Committee guaranteed that, in the selection of investment vehicles, many of the best, low-cost investment vehicles would not be considered.

106.   Here again, one of the first corrections BBVA made, after terminating Envestnet, was to introduce low-cost CIT investment vehicles. This included a low-cost suite of target date funds offered by Vanguard as CITs.  This change by itself dramatically reduced investment costs and improved the investment performance of the Plan.

### BBVA Did Not Justify The Costs And Risks Of Its Investment Strategy

107.   BBVA had a fiduciary duty to determine that the fees charged by the managers of the Plans' mutual funds were justified by realistic evaluations of returns generated by the funds.  BBVA made no such determination.

108.   BBVA used two different performance standards for evaluating the performance of its investment options: (i) a peer group comparison; and, (ii) a risk-adjusted performance standard.

### Peer Group Performance Standard

109.   The peer group standard compared the performance of the BBVA funds to the performance of other funds in the same asset class.  The standard required that BBVA's funds be competitive with respect to their peers in the same asset class.  This standard is very useful in inefficient markets, where the average members of the peer group generate excess returns.  It is useless in efficient markets where the average fund in the peer group does not earn

its keep.  In this case, BBVA should have known that the asset classes in which the Plan was invested were largely efficient. The peer groups of actively managed funds in those asset classes generated *negative* excess returns. Comparing the performance of funds to a peer group that on average loses money compared to their benchmark indices is useless, even misleading. Here, it served to hide the fact that BBVA's funds consistently underperformed their benchmarks.

110.   BBVA did not have a prudent process for monitoring and evaluating the performance of the mutual fund managers to verify that they actually were delivering excess returns net of fees.

### The Risk-Adjusted Performance Standard

111.   BBVA also failed to prudently monitor the risk adjusted performance of the Plan's investment options. The SIP required that the risk-adjusted performance of the Plan's investments exceed that of the benchmark indices and peer group over 5-year rolling periods (a full market cycle) and over 3-year rolling periods (less than a full market cycle),

112.   The risk adjusted performance standard, known as the "Shape ratio," is a valid standard.  The Sharpe ratio was named for Nobel Prize winner William F. Sharpe.  *See, e.g.,* William F. Sharpe, *Investors and Markets: Portfolio Choices,* Asset Prices, and Investment Advice (Princeton University Press 2007). The Sharpe ratio is the ratio obtained by dividing: (1) the mutual fund portfolio's expected excess return over the riskless rate of interest by (2) the

standard deviation of its excess return. All other things being equal, an actively managed fund that has a higher Sharpe ratio than its benchmark index net of fees is a good investment. Such a fund will outperform a passively managed fund invested in the index on a risk adjusted basis.

113.   Here, the BBVA funds consistently performed worse than their benchmarks on a risk adjusted basis.  Most had negative Sharpe ratios over the Class Period.  Over trailing five year periods almost all of BBVA's funds underperformed both their benchmarks and index-fund alternatives over the Class Period.

114.   *Figure 6* shows the risk-adjusted performance of BBVA's actively managed funds compared to their indices and Vanguard benchmarks over the Class Period:

**Figure 6:**   *Risk-Adjusted Performance (Sharpe Ratio) of BBVA Funds Compared to Index and Index Fund Benchmarks*[34]

| Fund Names | 3 YEAR AVG v INDEX | 5 YEAR AVG v INDEX | 3 YEAR AVG v VANGUARD | 5 YEAR AVG v VANGUARD |
|---|---|---|---|---|
| Aston/TAMRO Small Cap I | -0.23 | -0.19 | -0.32 | -0.32 |
| Dodge & Cox Stock | -0.17 | -0.18 | -0.10 | -0.11 |
| American Century Diversified Bond | -0.34 | -0.39 | -0.30 | -0.35 |
| Principal Mid Cap Value Fund | -0.10 | -0.10 | -0.13 | -0.13 |
| Principal Lifetime 2015 Fund | -0.06 | -0.07 | -0.14 | -0.13 |
| Principal Lifetime 2020 Fund | -0.07 | -0.06 | -0.13 | -0.11 |
| Principal Lifetime 2025 Fund | -0.05 | -0.05 | -0.10 | -0.09 |
| Principal Lifetime 2030 Fund | -0.04 | -0.03 | -0.08 | -0.07 |
| Principal Lifetime 2035 Fund | -0.03 | -0.03 | -0.06 | -0.05 |
| Principal Lifetime 2040 Fund | -0.04 | -0.03 | -0.05 | -0.04 |
| Principal Lifetime 2045 Fund | -0.04 | -0.03 | -0.06 | -0.05 |
| Principal Lifetime 2055 Fund | -0.05 | -0.05 | -0.07 | -0.06 |
| Principal Lifetime 2050 Fund | -0.04 | -0.04 | -0.06 | -0.06 |
| Principal Lifetime Strategic Income | -0.04 | -0.01 | -0.14 | -0.04 |
| Thornburg International Value | -0.05 | 0.00 | -0.02 | 0.05 |
| JP Morgan Mid Cap Growth | -0.06 | -0.08 | 0.01 | 0.00 |
| Harbor Funds Capital Appreciation | -0.17 | -0.15 | -0.16 | -0.16 |
| Invesco International Growth | -0.31 | -0.32 | -0.23 | -0.23 |

115.   At the time BBVA terminated Envestnet, Envestnet's own research demonstrated conclusively that the BBVA funds were not meeting the risk adjusted performance criteria. The funds had a long history of underperformance that BBVA did nothing to correct.   BBVA ultimately terminated Envestnet, replacing it with Towers Watson. But by then, BBVA had already wasted a substantial portion of participants' retirement savings.

---

[34] *Figure 6* is a summary of information contained in **Schedules F.1. through F.36. Schedule F** paints a picture, in black and red, of a failed investment strategy.

*Chronic Underperformance*

116.    The consistent underperformance of the BBVA funds compared to index and index fund benchmarks is shown on ***Schedule D.***  The bottom line is summarized in ***Figure 7***:

***Figure 7.***    *Returns of Plan v Benchmark[35]*

| Returns | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| Plan Funds | 21.70 | 5.68 | –0.05 | 6.80 | 18.88 | –4.87 | 23.18 | 14.42 |
| Benchmark Indices | 21.86 | 7.18 | 1.53 | 7.53 | 19.42 | -3.90 | 24.21 | 15.04 |
| Difference (in %) | -0.16 | -1.50 | -1.58 | -0.74 | -0.54 | -0.96 | -1.04 | -0.62 |

The BBVA funds underperformed their benchmark indices in each year during the Class Period from 2013 to 2020.  The underperformance was particularly severe during Envestnet's tenure from 2014 to 2016.  Performance was better from 2017 to 2020 during Willis Towers' tenure, but still far off the mark.

117.    ***Schedule D*** contains a fund-by-fund, year-by-year accounting of the performance of the plan funds and their relative performance compared to the index and Vanguard benchmarks.  The risk adjusted performance is shown in **Schedule F**. As demonstrated by ***Schedules D and F***, The failure of BBVA's investment strategy was persistent, severe, and plan wide.

---

[35] The asset weights for this calculation rely on the figures in BBVA's Form 5500s and do not take into account the reinvestment of the excessive fees. This is addressed in the total loss calculation below.

## Target Date Fund Example

118.    During the Class Period, BBVA invested in a suite of "target date retirement funds" (or, "TDFs") managed by Principal Financial Group.  The Plan's investment in these funds ranged from about $65 million at the end of 2013 to about $210 million at the end of 2016, representing approximately 15% to 30% of the Plan's assets during the relevant period.  The target date funds were the Plan's default investment option in the absence of investment instructions from the individual participant.

119.    Unlike regular mutual funds, target date funds do not invest in individual securities.  Rather, they are specialized "fund-of-funds" that invest in multiple equity and debt funds.  The balance of growth-oriented (equity) and conservative (fixed income) assets within the target date fund is determined by its "glide path" – the mix of equity and debt investments.  The glide path is chosen according to the target retirement date of the investor and rebalances to become more conservative as the target date approaches.  The Department of Labor advises that, within this general framework, there are many differences that "can significantly affect the way a TDF performs, [thus]

it is important that fiduciaries understand these differences when selecting a TDF as an investment option for their plan."[36]

120.    Target date funds require considerable diligence on the part of the plan sponsor, and the Department of Labor has issued detailed guidance for plan sponsors to follow in choosing and maintaining these specialized funds. Among other requirements, a plan fiduciary must establish a process for comparing and selecting target date funds; must understand the fund's investments and asset allocation; and must periodically review the fund's investment strategy and determine whether the fund's manager is effectively carrying out that strategy.  Because of the unique nature of target date funds, the plan fiduciary must monitor the fees and performance of target date funds not only at the fund-of-fund level, but at the underlying fund level as well.[37]  "TDF costs can vary significantly," and the plan fiduciary must "consider the fees for both the TDF and the underlying funds."[38]  For example, a plan sponsor should know whether the expense ratios of the component funds add up to the expense ratio for the target date fund, and if not, what expenses make up the difference, such as added expenses for asset allocation and rebalancing.[39]  A

---

[36] U.S. Dep't of Labor, Employee Benefits Security Administration, *Target Date Retirement Funds – TSIP for ERISA Plan Fiduciaries*, February 2013, available at dol.gov.

[37] *Id*.

[38] *Id*.

[39] *Id*.

prudent plan sponsor cannot invest in target date funds without knowing them inside and out.

121.    With the target date funds, BBVA committed practically all of the sins an investment fiduciary can commit. The most fundamental mistake BBVA made was that it failed to make expense ratios a primary factor in managing its investments. A prudent fiduciary would have given careful consideration to low-cost target date index funds.  There were any number of low-cost index funds available in the target date (or "balanced") asset class, including Vanguard Target Retirement funds. *See Figure 1* above (average annual ER of 0.74% for Plan's target date funds versus 0.18% ER for Vanguard benchmarks).[40] Ignoring first principals of fiduciary investment management, BBVA selected and retained high-cost BBVA target date funds when far less expensive comparable products were available.

122.    In addition to pursuing an unnecessary, high-cost investment strategy for the target date funds, BBVA breached the fiduciary duty of competence.  BBVA itself was not competent to implement a high-cost, actively managed investment strategy, and failed to retain an investment advisor that had demonstrated the skill to implement the strategy effectively.

123.    If BBVA (or its investment advisor) had done its due diligence, as a competent fiduciary must, it would have known that the Principal LifeTime

---

[40] The Vanguard funds also are available as an institutional CIT with an average ER of 9 bps.

48

funds did not have a consistent track record of beating the market. **Schedule E.1.** and **Schedule E.2.** of the Appendix shows the excess returns of the Principal funds compared to their benchmark S&P target date indices for the years *before and during* the Class Period.

124.    Additionally, also for the years preceding the Class Period, the *underlying* U.S equity funds in which the BBVA target date funds invested had also had high-expense ratios and transaction costs compared to low-cost index fund alternatives. (*See **Schedule E***).   The funds underperformed their benchmarks and failed to demonstrate any ability to generate excess returns. (*See **Schedule E***).

125.    The most recent (2019) data from S&P Global confirm that the U.S. equity funds asset class remained a low-percentage bet during the Class Period, with equity, debt, and fixed income funds underperforming their benchmarks on a risk adjusted basis net of fees.  As of 2019, actively managed funds in this asset classes failed to meet their benchmarks 85.5%, 96.6, and 92.8% of the time over 5, 10 and 15-year periods, respectively.   Again, the same is true of the equity and fixed income fund asset classes in which the target date funds were invested. (*See **Schedule E.7-8***). The efficient asset classes in which the Principal funds

were invested presented few inefficiencies for active managers to exploit. A prudent fiduciary would have known that; the data was available.

126.   BBVA and Envestnet did not make a determination that the additional costs of the actively managed funds were justified by a realistic prospect of excess returns. Having failed to conduct the required due diligence on the fees and performance of the funds at the fund-of-funds or underlying level, BBVA had no way of knowing whether there was a reasonable expectation that the managers of the target date funds would cover their costs. Columbus Regional did not simply make a mistake, it had no idea what it was doing.

127.   BBVA also failed to consider that Principal itself offered substantially similar target date funds at a lower cost. In 2015, Principal began offering a new suite of target date funds, the Principal LifeTime Hybrid target date funds, which provided substantially the same asset class exposure as the Principal LifeTime target date funds, but at a lower cost. The funds have the same benchmark, asset class exposure and strategy – but the LifeTime Hybrid product was far less expensive. The total amount of additional fees incurred by participants as a result of BBVA's selecting the more expensive product, shown on *Schedule E.5.,* was **$940,780** through the end of 2016.

128.   Predictably, BBVA's low percentage bet on the high-cost managers at Principal did not pay off. The BBVA funds, as they had prior to the class period, consistently failed to beat their benchmarks consistently over time.

***Figure 8.*** *Performance of Target Date Funds During Class Period Compared to Vanguard Benchmark*

| Principal Fund | Vanguard Fund | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Principal Lifetime 2015 | Vang'd Tgt Ret 2015 Inv | -0.03 | -0.16 | -0.06 | -0.08 |
| Principal Lifetime 2020 | Vang'd Tgt Ret 2020 Inv | 0.07 | -0.11 | -0.06 | -0.07 |
| Principal Lifetime 2025 | Vang'd Tgt Ret 2025 Inv | -0.14 | -0.14 | -0.03 | -0.15 |
| Principal Lifetime 2030 | Vang'd Tgt Ret 2030 Inv | 0.08 | -0.05 | 0.00 | -0.12 |
| Principal Lifetime 2035 | Vang'd Tgt Ret 2035 Inv | -0.25 | -0.12 | 0.05 | -0.30 |
| Principal Lifetime 2040 | Vang'd Tgt Ret 2040 Inv | -0.08 | -0.07 | 0.08 | -0.28 |
| Principal Lifetime 2045 | Vang'd Tgt Ret 2045 Inv | -0.22 | -0.10 | 0.08 | -0.33 |
| Principal Lifetime 2055 | Vang'd Tgt Ret 2055 Inv | -0.15 | -0.11 | 0.10 | -0.31 |
| Principal Lifetime 2050 | Vang'd Tgt Ret 2040 Inv | 0.04 | -0.05 | 0.08 | -0.27 |
| Principal Lifetime Strat Inc | Vang'd Equity-Income Inv | -2.65 | -0.85 | -0.17 | -1.32 |

129.   None of the target date funds outperformed the benchmark over the Class Period.  While a prudent plan sponsor never would have made the investment in the first place, a prudent plan sponsor, having made that mistake, would soon have removed and replaced the funds as an investment option.

130.   In 2017, BBVA finally realized it had made a mistake and removed the Principal LifeTime target date funds from the Plan.  BBVA replaced the high-cost Principal funds with a low-cost Vanguard Target Retirement index fund alternative. This dramatically reduced the average expense ratio of the target date suite, from 76bps down to 9bps.  Upon the elimination of the excess fees, the performance of the Plan's target date funds improved substantially,

but not before a substantial amount of money was unnecessarily wasted on high-fee funds whose performance did not justify the additional cost.

## THE PRICE PARTICIPANTS PAID

131.   BBVA made a massive bet on an actively managed investment strategy with participants' money, then breached its fiduciary duty to participants by failing to monitor and remove from the Plan's investment menu a series of high-fee funds when they failed to meet, must less beat, their benchmarks.

132.   When the funds underperformed their benchmarks, the participants suffered a massive loss.  The loss was the natural and proximate result of the expense ratios, transaction costs, and other costs of the high-fee mutual funds that BBVA maintained during the course of the Class Period.  The impact of these costs and fees was magnified by the effect of compounding.

133.   The standard for determining the impact of underperforming mutual funds is the comparison of the investment performance of the assets of the Plan invested in high-fee funds in the plan to the investment performance that assets of the Plan would have had if invested in low-cost index funds. *Brotherston v. Putnam Invs., L.L.C.*, 907 F.3d 17 (1st Cir. 2018).  This can be estimated by taking the weighted average of the mutual funds from the plan's investment menu and using publicly available data on mutual fund returns. Additionally, in calculating losses, it is appropriate to "presume that the [plan's] funds would have been used in the most profitable" of any reasonable

and alternative investment strategies.  *Tibble v. Edison Int'l*, No. CV 07-5359 SVW, at 21 (C.D. Cal. Aug. 16, 2017) (decision after remand) (quoting *Bierwirth*, 754 F.2d at 1056).

134.   Based upon the information presently available, Plaintiffs esti-mate that, to date, the Plan participants have lost **$42 to $67 million** of their retirement money as a result of BBVA's mismanagement of the money market and mutual funds.  The loss can be estimated by comparing the performance of the Plan had it been properly invested.

135.   The total estimated loss[41] through December 31, 2019 is:

***Figure 9.***   *Total Loss Over Class Period (in $U.S. millions).*



136.   The $42 to $66 million loss cannot be explained by standard pricing models taking risk and return into account. The average BBVA mutual fund was riskier than the average index fund benchmark, which means that the Plan returns adjusted for risk are even worse than the returns shown.[42]  Nor can the loss be attributed to any other commonly accepted risk and return

---

[41] The estimate assumes that the Form 5500s are accurate as to the plan investments and that the contributions to and deductions from the funds were made monthly and were uniform.  The estimate assumes that the contributions in 2018 were the same as in 2017. Plaintiffs reserve the right to refine the loss estimate once additional information is made available.

[42] *See, e.g.*, Modigliani, Franco, "Risk-Adjusted Performance", Journal of Portfolio Management (Winter 1997): 45–54 (portfolio's excess return adjusted based on the portfolio's relative riskiness with respect to that of the benchmark portfolio).  Modigliani is the recipient of the 1985 Nobel Prize in Economics.  The riskier—in technical terms, higher beta—BBVA funds put participants at greater risk in the event of a market downturn.

factors.[43]  Simply put, the losses were the result of excessive fees, not bad luck.

137.   With respect to mutual funds, the loss was primarily the result BBVA's selection and retention, month after month, quarter after quarter, year after year, of funds that paid excessive fees to investment managers whose cost were not justified by any realistic prospect of generating excess returns.  The fees resulting in the loss included both fees such as investment management fees and "hidden" fees such as transaction costs resulting from turnover ratio. BBVA would have been aware of this and should have removed the funds, had BBVA monitored the cost of the funds and their performance net of costs.

138.   The loss with respect to the money market fund resulted from a total failure by BBVA to manage the Plan's short-term bond fund investments. A plan fiduciary that has engaged in the investment equivalent of stuffing money into a mattress cannot claim that a loss was avoided merely because it held onto the mattress.

## BBVA'S ADMINISTRATIVE PROCESS

### As Applied Here, BBVA's Administrative Process Constituted A Prohibited Transaction; And In Any Case, The Decision Of The Retirement Committee Should Be Ignored.

139.   According to BBVA, Plaintiff Drake and other Plan participants were obligated to pursue their claims for breach of fiduciary duty through

---

[43] This would include the application of the Fama / French factors discussed by Fama / French and Carhart, supra.

BBVA's administrative process before filing suit.  That is not merely wrong, it is nonsensical.  As is apparent from BBVA's own Plan documents, BBVA's administrative process is not intended to address such claims.  BBVA has no process for addressing such claims; the Plan does not provide any procedural mechanism for filing such claims.  Further, the Retirement Committee is incompetent to address such claims and, moreover, is impossibly conflicted.  BBVA's administrative process is a routine claim handling process that applies to participants' claims for *benefits* such as retirement, disability and death benefits – not claims brought on behalf of all participants for losses totaling millions of dollars resulting from the Retirement Committee's breaches of its fiduciary duties to the Plan and participants, losses for which the members of the Retirement Committee have personal liability.

140.   Nevertheless, the Retirement Committee purported to decide Plaintiff's claims.  Because it had no authority to do so, however, its decision is a nullity and should be ignored.

141.   Alternatively, even if the Retirement Committee were authorized to hear such claims, the committee was in this instance so conflicted that its review and determination of the claims constituted a prohibited transaction under ERISA Section 406(b)(2), 29 U.S.C. § 1106 (b)(2).  Again, any resulting decision is a nullity and should be ignored.

142.   Additionally – in any case, and no matter the process that produced it – the Retirement Committee's decision is entitled to no weight.  Be-

cause the Plan confers no discretionary authority on the Retirement Commit-
tee when reviewing and deciding claims, this Court reviews the committee's
claims decisions *de novo*.

### BBVA's Administrative Process And Ensuing Litigation

143.   Plaintiff, and two other Plan participants, Gloria Ferguson and
Cassandra McClinton, previously submitted their claims for review and deter-
mination by the Retirement Committee, under protest, as directed by BBVA.

144.   While the Plan sets out an administrative appeals process, it is –
unsurprisingly – only intended to address denials of benefits claims, such as
for retirement, disability and death benefits.[44]   The Plan is silent respecting
claims for breach of fiduciary duty, the kinds of claims at issue here.

145.   The Summary Plan Description ("SPD"), the document provided
to participants in lieu of the full Plan document, summarizes, among other
things, the terms of the Plan, the claims and appeals process and participants'
legal rights.   The SPD describes in detail the process for making a claim for
benefits, and the administrative process for reviewing an adverse benefits de-
termination.   After describing that lengthy process, the SPD provides that if a

---

[44] "Benefit" is not expressly defined under ERISA, nor by the Plan.  However, ERISA
defines "employee welfare benefit plan" to mean any plan, fund or program estab-
lished or maintained for the purpose of providing participants and their beneficiar-
ies "(A) medical, surgical, or hospital care or benefits, or benefits in the in the event
of sickness, accident, disability, death or unemployment, or vacation benefits, ap-
prenticeship or other training programs, or day care centers, scholarship funds, or
prepaid legal services, or (B) any benefit described in section 186 (c) [respecting la-
bor relations, satisfaction of court or arbitration award, certain arms-length trans-
actions, etc.] . . . ."  29 U.S.C. § 1002(1).

claim for benefits is denied or ignored, the employee may then file suit in state or federal court.

146.   On the other hand, "[i]f plan fiduciaries misuse the plan's assets," the SPD does not specify relief through BBVA's administrative process.  Rather, in that instance, the SPD specifies that "assistance may be sought from the U.S. Department of Labor, or suit may be filed in federal court."

147.   The Plan confers no authority or discretion on the Retirement Committee to review, or to make any determination respecting, the kind of claims at issue here.  The Plan provides in relevant part that the Retirement Committee "shall":

(a)   Construe and interpret the Plan, decide all questions of eligibility including, without limitation, the determination of those individuals who are deemed employees of the Employer (or any Affiliated Employer) and determine [the] manner of payment of nay benefits hereunder;

(b)   Determine whether any amount is included in a Participant's[45] Compensation[46];

(c)   Prescribe procedures to be followed by Participants or Beneficiaries in filing for benefits; [and] . . .

(h)   Determine the time of distribution of benefits . . .

The Retirement Committee's remaining enumerated duties generally involve recordkeeping.

---

[45] The Plan document defines a "Participant" as an Employee who participates in the Plan and is otherwise eligible under plan requirements respecting length and continuity of employment, and so forth.

[46] The Plan document defines "Compensation" and several related terms at length; in general, it has the ordinary meaning: salary or wages, excluding bonuses and other "extraordinary remuneration."

148.   The Plan specifies: "[t]he Retirement Committee shall have no power to add to, subtract from or modify any of the terms of the Plan, or to change or to add to any benefits provided by the Plan, or to waive or fail to apply any requirements of eligibility for a benefit under the Plan."

149.   The Plan contains no provision authorizing the Retirement Committee to review or decide claims by participants respecting anything other than "benefits," nor any provision authorizing the committee to prescribe procedures to be followed in filing claims other than for "benefits."

150.   On May 16, 2019, Ms. Ferguson's attorney wrote to Troy Farnlacher, BBVA's benefits director:

> We have observed, by examining the Plan's Form 5500s, that the costs and expenses of administering the Plan, are outside of a normal range. We are, therefore, interested in whether the Plan can provide written documentation that it had a prudent methodology for the selection of the investment options for the Plan menu. . . .

> In addition, we are not aware of any provision in the plan documents that provides for grievances regarding the Plan. If there is such a process, please identify it with specificity in your response to this letter, and produce all documents related to the administrative process.

151.   On May 24, 2019, Mr. Farnlacher responded, claiming that Ms. Ferguson's requests were "unclear, overly broad, and do not appear to be within the scope of Section 1024(b)(4)." Mr. Farnlacher did not specify any administrative process for addressing grievances regarding the Plan, such as claims for breach of fiduciary duty. On behalf of BBVA, Mr. Farnlacher provided Ms. Ferguson with copies of the Plan, the SPD, the latest annual report, a trust

agreement, investment policy statement, and a participatory disclosures invoice.

152.   On June 18, 2019, counsel for Ms. Ferguson wrote back, seeking clarification.

153.   Mr. Farnlacher responded on July 19, 2019, refusing to provide any more information or documents other than "select" account statements.

154.   The day before Mr. Farnlacher responded, having waited a month after requesting clarification, Ms. Ferguson and Ms. McClinton filed their Complaint (the "Ferguson Complaint") on July 18, 2019 for breach of fiduciary duty under ERISA, 29 U.S.C. §§ 1001-1461, styled *Gloria Ferguson and Cassandra McClinton, individually and on behalf of others similarly situated, vs. BBVA Compass Bancshares, Inc., Compass Bancshares, Inc. and BBVA USA Bancshares, Inc.*, In the United States District Court for the Northern District of Alabama, Southern Division, Case No.: 2:19-cv-01135-MHH (the "Ferguson Action").

155.   The Ferguson Complaint describes the documents and language relied upon by plaintiffs in that action in determining that no administrative remedies applied to their claims:

> Named Plaintiffs (as defined herein) have exhausted all available administrative remedies pursuant to 29 U.S.C. § 1133, prior to the filing of this Complaint (there are none). There are no provisions or procedures in the plan documents to make or appeal the decisions of the Defendant in regard to breach of fiduciary duty claims. The designated remedy for a breach of fiduciary duty claim is a suit filed in federal Court. Counsel for the named Plaintiffs requested access to any administrative procedures

and none were provided. Thus, Named Plaintiffs exhausted all administrative remedies prior to filing, having confirmed there are none; to the extent Defendant alleges that some other procedure exists, based upon the information available to the Named Plaintiffs, it is clear such procedures and process are futile.

156.    On September 19, 2019, BBVA moved to dismiss the Ferguson Action, arguing that plaintiffs had not exhausted their administrative remedies. (Ferguson Action, Dkt. No. 15-Main).

157.    On October 2, 2019, Ms. Ferguson's counsel wrote the BBVA Retirement Plan Administrator, the 401(k) Plan Administrator and the Retirement Committee and informed them that he represented Ms. Ferguson and Ms. McClinton, enclosed a copy of the Ferguson Complaint and made a formal claim for relief under the Plan on behalf of Ms. Ferguson and Ms. McClinton.

158.    Also on October 2, 2019, Plaintiff Drake's counsel, D. G. Pantazis, Jr., wrote the BBVA Retirement Plan Administrator, the 401(k) Plan Administrator and the Retirement Committee and informed them he represented Ms. Drake, enclosed a copy of the Ferguson Complaint and made a formal claim for relief under the Plan on behalf of Ms. Drake.

159.    On October 16, 2020, Mr. Farnlacher, "On Behalf of the Committee," wrote Mr. Pantazis and advised him that "the Committee" considered the Ferguson Complaint to be a notice of a claim for "benefits" on behalf of Ms. Ferguson, Ms. McClinton and Ms. Drake and that the Retirement Committee would consider the claims under Section 8.7 of the Plan.

160.    On October 29, Mr. Pantazis wrote Mr. Farnlacher stating, "we

wish to make it abundantly clear that the claims alleged by our clients are for breach of fiduciary duty pursuant to ERISA § 502(a)(2) and for additional relief provided for in ERISA §502(a)(3)."

161.   On November 1, 2019 Mr. Farnlacher, "On Behalf of the Committee" wrote Mr. Pantazis and advised him the "The Committee is authorized and prepared to address Claimant's claim for breach of fiduciary duty under ERISA Section 502(a)(2) and (3) in accordance with Article 8 of the Plan."

162.   ERISA Section 502, 29 U.S.C. 1132, comprehensively addresses the "civil enforcement" of ERISA benefits and rights and begins, "[a] civil action may be brought . . . ."   Section 502 authorizes the Secretary of Labor, plans, participants and States to bring claims, and confers exclusive jurisdiction to hear such claims on the federal district courts (except that State courts have concurrent jurisdiction of certain claims affecting State interests).[47]

163.   Article VIII of the Plan is captioned "Distribution of Benefits."   Article VIII does not address the process for filing any claim, even a claim for benefits.   Rather, Section 8.7 of Article VIII describes the process for administratively appealing a denied claim.   (*See* Plan, Art. VIII, § 8.7 (a) ("General Claim Procedure") (1) ("Claim Denial") and (2) ("Appeal of Denied Claim")).

164.   On April 1, 2020, the Retirement Committee denied the claims of

---

[47] Section 502 distinguishes "benefits" and "rights."   Section 503 establishes administrative requirements respecting a denial of *benefits*.   *See* 29 U.S.C. § 1133 (establishing administrative notice and review requirements for participants and beneficiaries whose "claim for benefits" has been denied).   Section 503 does not address the violation of rights.

Ms. Ferguson, Ms. McClinton and Ms. Drake.

165.    On May 12, 2020, the Court, Judge Haikala, denied BBVA's motion to dismiss the Ferguson Action.  (Ferguson Action, Dkt. No. 23).  Judge Haikala found that the Ferguson plaintiffs' interpretation of the Plan's requirements "is reasonable, and the plaintiffs' failure to avail themselves of the administrative remedies provided for in § 8.7 of the Plan is excused." (*Id*. at 10).  Judge Haikala also found that the SPD provides several "alternative avenues of recourse, none of which is mandatory," including filing suit in federal court, and noted that "[t]he word 'exhaustion' does not appear in the SPD."  (*Id*. at 8-9). Thus, "under the language of the SPD, 'misuse' is not the only key that opens the door to a lawsuit in federal court."  (*Id*. at 10).

166.    On June 1, 2020, Ms. Drake appealed the Retirement Committee's denial of her claim. Ms. Ferguson and Ms. McClinton did not appeal the Retirement Committee's denial of her claim, opting to continue pursuing the Ferguson Action, which remains pending.

167.    On September 29, 2020 the Retirement Committee denied Ms. Drake's appeal of its decision to deny her claim and instructed her that she had a ninety (90) day deadline to file a lawsuit. This action follows.

## CLASS ACTION ALLEGATIONS

168.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of a plan to bring an action individually on behalf of the plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

169.   Plaintiff seeks to certify a class action on behalf of all participants and beneficiaries of the plan. Christine D. Drake ("Named Plaintiff") seeks to certify and to be appointed as representative of the following Class:

> All persons, other than Defendant(s), who were participants as of July 17, 2013 in Plan, including (i) beneficiaries of deceased participants who, as of July 17, 2013, were receiving benefit payments or will be entitled to receive benefit payments in the future, and (ii) alternate payees under a Qualified Domestic Relations Order who, as of July 17, 2013, were receiving benefit payments or will be entitled to receive benefit payments in the future; and (b) all persons, other than BBVA, who have been participants or beneficiaries in either the Plan and had account balances in the Plan at any time between July 17, 2013 through the date of judgment.

170.   Named Plaintiff is a member of the Class.  Excluded from the Class are (a) any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of any BBVA or is or was a partner, officer, director, or controlling person of BBVA; (b) the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of BBVA; (c) Plaintiffs' counsel; (d) sitting magistrates, judges and justices, and their

current spouse and children; and, (e) the legal representatives, heirs, successors and assigns of any such excluded person.

171.  This action meets the requirements of Fed. R. Civ. P., Rule 23 and is certifiable as a class action for the following reasons:

    a.    While the precise number of Class Members is unknown to Plaintiff at this time and can only be finally ascertained from books and records under the exclusive control of and maintained by BBVA and/or its agents, Named Plaintiff believes after inquiry that there are over 15,000 members of the Class located throughout the United States and that joinder of all members is impracticable; and,

    b.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class because BBVA owed fiduciary duties to the Plan and to all participants and beneficiaries, and took actions and omissions alleged herein as to the Plan, and not as to any individual participant; thus, there are effectively no individual issues. The common questions of law and fact include, without limitation:

        i.    who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109 (a);

        ii.    whether the fiduciaries of the Plan discharged their duties with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use;

        iii.    whether or not the fiduciaries, prior to the time they engaged in the transactions described herein, had policies and procedures to investigate the merits of the investments and to structure the investments;

        iv.    whether or not the fiduciaries followed the policies and procedures to investigate the merits of the investments and to structure the investments prior to making such investments;

        v.    whether or not the fiduciaries had policies and procedures to monitor the prudence of the investments on an ongoing

and regular basis, including but not limited to high-cost funds as alleged herein;

vi.    whether or not the fiduciaries followed the policies and procedures to monitor the prudence of the investments on an ongoing and regular basis, including but not limited to high cost    funds as alleged herein;

vii.    whether or not the fiduciaries understood and evaluated the plan fees and expenses associated with the plan's investments;

viii.    whether or not the fiduciaries discharged their duties with respect to the plan solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administration of the plan;

ix.    whether the Committee exceeded its authority, violated their duties of loyalty, or engaged in a prohibited transaction in attempting to decide Plaintiff's breach of fiduciary duties claims;

x.    whether or not any fiduciary knowingly participated in a breach of duty by another fiduciary;

xi.    whether or not any fiduciary knowingly failed to cure a breach of duty by another fiduciary;

xii.    the losses to the Plan resulting from each breach of fiduciary duty; and,

xiii.    what Plan-wide equitable and other relief should the Court impose in light of BBVA's breach of duty.

172.    Named Plaintiff's claims are typical of the claims of the Class because Named Plaintiff is or was a participant in the Plan during the time-period at issue in this action and all participants in the Plan were harmed in the

same manner by BBVA's misconduct.  The legal theories upon which Plaintiff is proceeding are typical as well.

173.   Named Plaintiff is an adequate representative of the Class because they were and are participants in the Plan.  Plaintiff and all the Class Members were the subject of the same pattern and practices of equitable and Class violations, and all sustained damages arising out of the same wrongful course of conduct. BBVA has acted or refused to act on grounds generally applicable to the Class.  Named Plaintiffs has no interest in conflict with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the Class.

174.   Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for BBVA in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans, as a practical matter, would be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.

175.   Therefore, this action should be certified as a class action under Fed. R. Civ. P., Rule 23(b)(1)(A) or (B).

176.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of over 15,000 participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be relatively small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no Class Member has an interest in individually controlling the prosecution of this matter, and Named Plaintiffs is unaware of any difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class action under Fed. R. Civ. P. Rule 23(b)(3), if it is not certified under Rule 23(b)(1)(A) or (B).

177.   Plaintiff's counsel, Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC; James White Firm, LLC; and, Lange Clark, P.C. will fairly and adequately represent the interests of the Class, have substantial experience in class action and complex litigation, and are best able to represent the interests of the Class under Fed. R. Civ. P. Rule 23(g).

## PLAN WIDE RELIEF

178.   Additionally and alternatively, Plaintiff brings this action as a Plan participant seeking Plan wide relief for breach of fiduciary duty on behalf

of the Plan. 29 U.S.C. § 1132(a)(2).  Defendants' fiduciary duties were to the Plan and the Plan itself was a victim of Defendants' breach of their fiduciary duties; thus, Plaintiff demands that Defendants make good to the Plan all losses to the Plan caused by their breach of their fiduciary duties. 11 U.S.C. § 1109.  The absent Plan participants are adequately represented and the Plan participants are so numerous that the delay and expense of joining them would be oppressive and burdensome.  Plaintiff will take adequate steps to properly act in a representative capacity on behalf of the Plan, will protect absent parties' interest as well as the interest of the judicial proceedings.

**COUNT ONE**

**BREACH OF FIDUCIARY DUTY**

179.   Plaintiff adopts by reference the factual allegations of paragraphs 1 through 178.

180.   This Count alleges breach of the fiduciary duty by Defendants in the selection and maintenance of the investment options for the Plan.

181.   The scope of the fiduciary duties and responsibilities of Defendants include managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable excess expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and

eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. (*Id.*) In order to do so, Defendants had to have a viable, documented process and methodology that improves the likelihood that participants' reach their retirement goals.

182. As the Supreme Court held, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *See Tibble*, 135 S. Ct. at 1829. Thus, to state a claim upon which relief can be granted, "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id*. Defendants failed to implement a prudent process of the selection, monitoring, and retention or, as the case may be, removal of investment options. Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. (*Id.*). Defendants therefore breached their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B). Defendants are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete

discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

183.   Defendants also knowingly participated in the breaches by other plan fiduciaries, knowing that such acts were breaches, enabling the other plan fiduciaries to commit the breaches by failing to lawfully discharge their own fiduciary duties, and failed to make any reasonable efforts under the circumstances to remedy the breaches. Thus, Defendants are liable for the losses caused by the breach of their co-fiduciaries under 29 U.S.C. § 1105(a).

184.   As a consequence of Defendants' actions, Named Plaintiff and the Class Members were damaged, including without limitation, suffering monetary losses.

## COUNT TWO
### RELIEF PURSUANT TO 29 U.S.C. § 1132

185.   Paragraphs 1 through 178 above are incorporated herein by reference.

186.   Plaintiff is authorized pursuant to 29 U.S.C. § 1132 (a) (1) to bring a civil action "to enforce [her] rights under the terms of the plan" and (a)(3) to enjoin, or to obtain "other appropriate equitable relief" respecting "any act or practice which violates . . . the terms of the plan," or "to enforce . . . the terms of the plan." Plaintiff also is entitled pursuant to 29 U.S.C. § 1132 (g) to an award of reasonable attorney's fees and costs.

187.   Neither the Plan nor the SDP provides an administrative process

for reviewing and deciding claims such as those pled in the Ferguson Action or in the present action, including without limitation claims for breach of fiduciary duty.

188.   The SDP expressly provides, "[I]f plan fiduciaries misuse the plan's assets . . . assistance may be sought from the U.S. Department of Labor, or suit may be filed in federal court."

189.   BBVA and the Retirement Committee are not authorized under the terms of the Plan and the SDP to review and determine claims for anything other than "benefits."

190.   BBVA and the Retirement are not authorized under the terms of the Plan and the SDP to review and determine claims such as those pled in the Ferguson Action or in the present action, including without limitation claims for breach of fiduciary duty.

191.   In purporting to administratively review and determine the claims of Ms. Drake (and Ms. Ferguson and Ms. McClinton and, effectively, all Plan participants), BBVA and the Retirement Committee acted outside the scope of their authority under the Plan and the SPD, in violation of the terms of the Plan and the SDP, and in contravention of the rights of Ms. Drake (and Ms. Ferguson and Ms. McClinton and, effectively, all Plan participants).

192.   Plaintiff, for herself and on behalf of the Plan and the Plan participants, demands that an injunction issue requiring BBVA and the Retirement Committee to cease and desist from violating the terms of the Plan and the SDP, including without limitation, by reviewing and deciding claims brought

under 29 U.S.C. §§ 1106 (prohibited transactions) and 1132, including without limitation claims for misuse of plan assets and for breach of fiduciary duty in connection with the administration, oversight or management of the Plan's investments (collectively, "Fiduciary Claims").

193.    Plaintiff, for herself and on behalf of the Plan and the Plan participants, demands that BBVA and the Retirement Committee be directed to allow participants asserting Fiduciary Claims to present those claims directly to the U.S. Department of Labor or the federal courts, as provided by the Plan and SDP and authorized under federal law, and without first submitting such claims to the Retirement Committee or any other administrative process established by BBVA.

194.    Plaintiff, for herself and on behalf of the Plan and the Plan participants, demands such other equitable relief as the Court may find necessary or appropriate.

195.    Plaintiff, for herself and on behalf of the Plan and the Plan participants, demands an Order declaring the decisions by the Retirement Committee and/or BBVA denying the claims presented by Ms. Drake and/or in the Ferguson Complaint to be outside the scope of their authority under the Plan, the SPD and federal law, and therefore, to be null and void.

196.    Plaintiff demands an award of reasonable attorney's fees and costs incurred in connection with the relief sought by this Count.

## COUNT THREE

### BREACH OF DUTY OF LOYALTY AND
### ENGAGING IN PROHIBITED TRANSACTIONS

197.   Paragraphs 1 to 178 above are incorporated herein by reference.

198.   "No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." The Federalist Papers, No. 10 (James Madison).   But that is precisely what happened here.   The Retirement Committee – the very people who breached their fiduciary duties to the Plan and participants – purported to decide whether Ms. Drake was entitled to recover for losses resulting from those breaches, losses for which the members of the committee are *personally liable* under ERISA.   Conflicted corporate directors would exit the boardroom without voting, and judges would recuse themselves.   But the members of the Retirement Committee, in flagrant disregard of their fiduciary duties to the Plan and participants and their personal conflicts of interest, judged their own cause in their favor and voted against Ms. Drake, the Plan and the other participants.

199.   ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), provides that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan.

200.   ERISA fiduciaries must scrupulously adhere to the duty of loyalty.

*See, e.g., DeFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 418 (4th Cir. 2007).

201.   ERISA Section 406(b)(2), 29 U.S.C. § 1106 (b)(2), prohibits a fiduciary from acting "in any transaction involving the plan on behalf of a party . . . whose interests are adverse to the interests of the plan."

202.   Acting in one's own interests constitutes acting "on behalf of a party" within the meaning of the statute.  *See Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1261 (1980).

203.   As a matter of law, a plan fiduciary who, in that capacity, "vote[s] not to sue himself" or even "actively participate[s] in the decisionmaking process" violates Section 406 (b)(2).  *Id*.

204.   In purporting to decide the claims of Ms. Drake (and Ms. Ferguson, Ms. McClinton and, effectively, the Plan and all participants), the Retirement Committee acted in its own interests, and not for the exclusive purpose of benefitting the Plan and participants, in violation of both Sections 404(a)(1) [duty of loyalty] and 406(b)(2) [prohibited transactions].

205.   Plaintiff, for herself and on behalf of the Plan and the Plan participants, demands an Order declaring the decisions by the Retirement Committee and/or BBVA denying the claims presented by Ms. Drake and/or in the Ferguson Complaint to violate Sections 404(a)(1) and 406(b)(2) and therefore, to be null and void.[48]

---

[48] Because the Plan confers no discretionary authority on the Retirement Committee when reviewing and deciding claims, even if the Retirement Committee were author-

206.   Plaintiff demands an award of reasonable attorney's fees and costs incurred in connection with the relief sought by this Count.

## PRAYER FOR RELIEF

207.   For these reasons, Named Plaintiff on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

<blockquote>

a.   Find and declare that Defendants has breached their fiduciary duties as described above;

b.   Find and adjudge that Defendants are personally, jointly and severally liable to make good all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

c.   Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated, including, without limitation, investment losses;

d.   Order BBVA to provide an accounting necessary to determine the amounts BBVA must make good to the Plan under § 1109(a);

e.   Surcharge against BBVA and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

f.   Certify the Class, appoint Named Plaintiffs as class representative, and appoint Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC, James White Firm, LLC, and Lange Clark, P.C. as Class Counsel;

</blockquote>

---

ized to review and determine the claims at issue here, this Court's review of the committee's decision(s) would be *de novo*.  *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (holding that a challenge to a denial of benefits is reviewed *de novo* unless the plan gives the administrator or fiduciary discretionary authority; and further, "[o]f course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" (citing Restatement (Second) of Trusts § 187, Comment d (1959)).

g.   Void the Committee's administrative decision;

h.   Award to the Named Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

i.   Order the payment of interest and the restoration of all investment losses by the Plan and its participants to the extent allowed by law; and

j.   Grant other equitable, legal, to the extent available, or remedial relief as the Court deems appropriate.

Respectfully submitted on this the 28th day of December, 2020.

/s/ James H. White IV
James H. White, IV
Counsel for Plaintiffs

OF COUNSEL:

JAMES WHITE FIRM, LLC
Landmark Center | STE 600
2100 1st Ave North
Birmingham, Alabama 35203
(205) 383-1812
james@whitefirmllc.com

/s/ D. G. Pantazis, Jr.
Counsel for Plaintiffs

OF COUNSEL:

WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500
dgpjr@wigginschilds.com
cmalmat@wigginschilds.com

/s/ *Lange Clark*
Lange Clark
Counsel for Plaintiffs

OF COUNSEL:

LAW OFFICE OF LANGE CLARK, P.C.
301 19th Street North
Suite 550
Birmingham, Alabama 35203
(205) 939-3933
langeclark@langeclark.com