

FILED

2021 Apr-15  PM 08:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| **CHRISTINE D. DRAKE,** individually and on behalf of others similarly situated, | |
| *Plaintiffs*, | Case No. 2:20-cv-02076-ACA |
| v. | |
| **BBVA USA BANCSHARES, INC., ROSILYN HOUSTON, SHANE CLANTON, JAVIER HERNANDEZ, KIRK PRESLEY, CELIA NIEHAUS, JOE HESLOP, ANGEL REGLERO,** individually and as members of the Investment Committee, and **ENVESTNET ASSET MANAGEMENT, INC.,** as investment fiduciary. | |
| *Defendants.* | |

## ENVESTNET ASSET MANAGEMENT, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.    PLAINTIFF HAS NOT ADEQUATELY ALLEGED THAT EAM WAS AN ERISA SECTION 3(21) FIDUCIARY WITH RESPECT TO THE CONDUCT ALLEGED ................. 8

II.   PLAINTIFF'S CLAIMS AGAINST EAM ARE TIME-BARRED BECAUSE THE FACTS GIVING RISE TO THE BREACH ALL OCCURRED MORE THAN SIX YEARS BEFORE SHE FILED HER COMPLAINT ................. 14

    A.    Plaintiff's Stable Value Fund Theory ................. 15

    B.    Plaintiff's Active-Management Theory ................. 17

    C.    Plaintiff's "Cover Up" Theory ................. 19

III.  THE FACTS PLED IN PLAINTIFF'S COMPLAINT DO NOT SUPPORT A PLAUSIBLE INFERENCE THAT EAM BREACHED ANY FIDUCIARY DUTIES ................. 20

    A.    Plaintiff's Theory That EAM Engaged in a Cover Up Does Not Plead a Plausible Fiduciary Breach ................. 20

    B.    Plaintiff's Active Management Claims Have Been Repeatedly Rejected By The Courts ................. 25

        1.    Plaintiff's Critiques of Active-Management are Inapposite ................. 25

        2.    Plaintiff Does Not Plausibly Allege That EAM Failed to Monitor the Plan's Investment Fees ................. 26

        3.    Plaintiff's Allegations Do Not Plausibly Claim That EAM Failed to Monitor Performance ................. 29

        4.    Plaintiff Does not Plausibly Allege That EAM Failed to Consider Lower Cost Investment Vehicles ................. 33

        5.    Plaintiff's Allegations Regarding WTW's "Corrections" Do Not Support Her Active-Management Theory ................. 34

        6.    Plaintiff Lacks Standing With Respect to Investments She Never Selected ................. 35

    C.    Plaintiff's Claim That EAM Failed To Monitor the Stable Value Fund Is Incoherent And Incompatible With The IPS Requirements ................. 36

        1.    EAM cannot be held liable for the handling of the Plan assets after the stable value fund was eliminated ................. 37

        2.    The benchmark previously assigned to the stable value fund is irrelevant ................. 38

        3.    Plaintiff's allegation that EAM failed to monitor the stable value fund is nonsensical ................. 38

IV.  PLAINTIFF HAS FAILED TO ADEQUATELY PLEAD A LOSS ATTRIBUTABLE TO ANY OF EAM'S ALLEGED BREACHES ................. 41

V.   PLAINTIFF'S CO-FIDUCIARY LIABILITY THEORY FAILS AS TO EAM ................. 44

# INTRODUCTION

Notwithstanding the verbosity of Plaintiff's complaint (over 200 separate paragraphs), none of the allegations state a plausible claim against Envestnet Asset Management, Inc. ("EAM").[1] Simply alleging that EAM was "the Plan's ERISA 3(21) investment advisor, and thus a fiduciary to the plan" does not make it so. Am. Comp. ¶ 14. In fact, while ERISA Section 3(21) provides that an investment advisor may be a fiduciary under certain conditions,[2] BBVA and Prima Capital Management, Inc. ("Prima"), which was acquired by EAM in 2012, expressly acknowledged that in serving as an investment consultant to the Plan, Prima, and hence EAM, would not be providing investment advice. *See* Ex. E, 2005 Services Agreement, at 10-11 (providing that Prima's "services . . . do not constitute the making or offering of investment advice[.]").[3] And more importantly, the applicable law instructs that for an investment advisor to qualify as a fiduciary under Section 3(21), its advice must serve as a **primary basis** for the challenged decisions.

---

[1] Plaintiff Christine D. Drake, a participant in the Compass SmartInvestor 401(k) Plan ("Plan"), filed this lawsuit claiming that defendants BBVA Bancshares, Inc. ("BBVA"), individual members of the Plan's Retirement Committee ("Retirement Committee"), and EAM breached their fiduciary duties with respect to the composition of the Plan's investment menu.

[2] Under 29 U.S.C. § 1002(a)(21)(A)(ii), "a person is a fiduciary to the extent . . . he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or property of such plan[.]"

[3] As explained in the accompanying declaration and request for judicial notice, the Court may consider the exhibits accompanying this motion, including the underlying plan document and other instruments governing the Plan, without converting the motion into one for summary judgment.

Plaintiff's allegations provide no plausible basis to reach that conclusion, and they belie the ability to do so.

Plaintiff does not allege that EAM, which inherited the role of investment advisor to the Plan when it acquired Prima, had any discretionary authority or control over the Plan's investment lineup. In fact, Plaintiff does not allege that EAM had any responsibility for any aspect of the Plan's administration. Rather, Plaintiff alleges that BBVA and the Retirement Committee "were directly responsible for making fiduciary decisions regarding the management of the Plan and its investment options." ECF No. 25, Am. Comp. ¶¶ 12-13, 15. Nothing in the Services Agreement or the Plan's Investment Policy Statement ("IPS") provided that EAM had any fiduciary responsibilities. In fact, EAM's role with respect to the Plan's investments was limited to assisting the Retirement Committee with fulfilling the Retirement Committee's fiduciary duties with respect to the Plan's investment menu. Ex. B, 2008 IPS, at 2. And even at that, EAM's assistance was for only **nine months** of the time period covered by the Amended Complaint.[4]

---

[4] This lawsuit was filed on December 28, 2020. Because ERISA imposes a six-year statute of repose, the time period governed by this lawsuit dates back to December 28, 2014. See 29 U.S.C. § 1113. Plaintiff acknowledges that ERISA's six-year limitations period establishes the relevant class period. Am. Compl. ¶ 19 n.7. (Plaintiff's reference to the class period as beginning on July 17, 2013 is an apparent error.) Plaintiff also acknowledges that EAM was terminated on September 30, 2015. Id. ¶ 14. Thus, EAM was engaged as the Plan's consultant for only the first nine months of the relevant time period (i.e., December 28, 2014 to September 30, 2015).

Quite telling, in the first iteration of this lawsuit brought by Plaintiff's counsel, which similarly challenged the investment options offered by the Plan, EAM was not named as a defendant.[5]   Plaintiff's apparent afterthought to toss EAM into a second lawsuit 16 months later—with virtually no facts plausibly connecting EAM to the conduct at issue—does not suffice to state a claim against it. Other courts have appropriately dismissed similar claims against plan investment advisors that are named alongside of the plan's named or appointed fiduciary.

## BACKGROUND

Plaintiff is a participant in the Plan, which is an individual account defined contribution plan sponsored by BBVA for its employees and organized under section 401(k) of the Internal Revenue Code, 26 U.S.C. § 401(k). Am. Compl. ¶¶ 10-11. Like most 401(k) plans, the Plan's participants each have an account, which is funded through a combination of employee salary deferrals and employer contributions by BBVA. *Id.* ¶ 11. Participants have sole and exclusive control over the assets in their individual accounts and can invest those funds in one or more of the Plan's various investment options. *Id.* ¶ 33.

BBVA is the "Plan Administrator" and the named fiduciary under the Plan. *Id.* ¶ 12. BBVA appointed the Retirement Committee to, *inter alia*, select and

---

[5] The instant lawsuit is virtually identical to the claims in an earlier suit originally filed against BBVA, but not EAM, by Plaintiff's counsel. *See Ferguson v. BBVA*, 19-cv-1135 (N.D. Ala. filed July 18, 2019). That lawsuit remains pending before Judge Haikala.

manage the Plan's investments and oversee the administration of the Plan. *Id.* ¶ 13. In 2012, after EAM's acquisition of Prima, the Retirement Committee continued with EAM as its investment consultant under the parties' Services Agreement.

EAM's responsibilities, which were described in the parties' Services Agreement, were limited to:

(1) assisting BBVA in the "review, evaluation, and preparation of investment policies, objectives, and guidelines" for the Plan;

(2) assisting BBVA with "identifying mutual funds that [were] consistent . . . with the Plan's investment policies, objectives, and guidelines"; and

(3) "conducting a full review of the Plan's mutual funds," focusing on "performance, personnel, adherence to the investment mandate, and regulatory issues[,]" the funds' "status according to the applicable Plan investment policies," and "such other details . . . as the Retirement Committee may reasonably request."

Ex. E, 2005 Services Agreement, at 2. EAM had no independent obligation to recommend that investment funds be replaced, added to the Plan, or removed. Rather, EAM was only required to evaluate and recommend replacement or additional funds "[w]hen considered necessary or appropriate by the Retirement Committee." *Id.* EAM also had no responsibility for the performance of any of the investments it recommended. *Id.* at 10-11 ("Notwithstanding any other provision contained herein, Prima does not represent and warrant the performance of the investments of the plans or represent and warrant that Prima's advice with respect to the investments of the plans will be successful.").

The parties' respective responsibilities, a description of the Plan's investments, and the process for monitoring the Plan's investments were also described in the Plan's IPS. The IPS instructed that the Retirement Committee was responsible for, *inter alia*, (1) developing the Plan's investment program, (2) identifying "appropriate and prudent" investment options, (3) monitoring the Plan's investments "to determine whether those responsible for investment results are meeting the guidelines and criteria identified in the IPS," and (4) taking affirmative action "if objectives are not being met or if policies and guidelines are not being followed." Ex. B, 2008 IPS, at 4. The IPS further stated that the Retirement Committee was responsible for reviewing the performance of the Plan's investment options to ensure their "continued appropriateness . . . for the benefit of the Plan." *Id.* at 15. In contrast, the IPS explained that EAM's role was limited to assisting the Retirement Committee in discharging its fiduciary responsibilities. *Id.* at 4 ("The Retirement Committee may retain the services of [an] Investment Consultant to . . . help discharge its fiduciary responsibility in furtherance of the Plans' goals and objectives.").

After its acquisition of Prima and until EAM's termination on September 30, 2015, EAM served as the Retirement Committee's investment consultant in accordance with the IPS and the parties' Services Agreement.[5] After terminating

---

[5] Because the time period covered by the Amended Complaint begins on December 28, 2014, *see supra*, at

EAM's engagement, BBVA hired Willis Towers Watson ("WTW") to serve as the Plan's investment consultant. In subsequent years, WTW recommended that the Retirement Committee add just two additional index funds to the Plan's investment lineup and change the manager of the Plan's target date funds from Principal to Vanguard. WTW did not recommend that the Retirement Committee remove or replace any of the other investment options selected by the Retirement Committee while EAM was the Plan's investment consultant. *Compare* Am. Compl. ¶¶ 100, 106 (identifying investment options as of 2013), *with* Ex. H, 2019 Form 5500, at 36 (identifying current investment options), *and* Am. Compl., Schedule A, App'x at 2 (identifying investment options available between 2013 and 2019).

## THE AMENDED COMPLAINT

Of the three counts pled in the Amended Complaint, EAM is named as a defendant only with respect to Count I, which claims that each of the named defendants breached their fiduciary duties in managing the Plan's investments. Am. Compl. ¶ 231. Plaintiff's allegations in support of Count I generally fall into three categories. *First*, Plaintiff claims that all defendants are liable for lost investment returns attributable to their alleged failure to offer participants a particular investment option—specifically, a stable value fund—after the Retirement

---

n.4, EAM, rather than Prima, was the investment consultant to the Plan until its termination on September 30, 2015.

Committee removed the Plan's original stable value fund for poor performance. *Second*, Plaintiff claims that all defendants mismanaged the Plan's investment menu by offering actively-managed mutual funds that were more expensive than, and allegedly underperformed compared to, certain passively-managed index funds that Plaintiff would have preferred. *Third*, Plaintiff claims that EAM attempted to "cover up" the alleged high cost and poor performance of the Plan's investments by manipulating and proposing changes to the IPS criteria that the Retirement Committee used to evaluate those investments. Of these three categories, Plaintiff only directly implicates EAM in the final one. As to the first two categories, Plaintiff simply lumps EAM in with the other defendants but says nothing about EAM's particular role.

## **ARGUMENT**

A motion to dismiss is an "important mechanism for weeding out meritless claims" for fiduciary breach in ERISA cases. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 424 (2014). As elsewhere, a court should not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 663, 678-79 (2009). Rather, to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a claim must be "plausible," meaning that it raises "more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. In making that determination, the court must accept well-pleaded allegations as true and draw

reasonable inferences in the plaintiff's favor, but it "need not accept as true statements of law or unsupported conclusory factual allegations." *Id*. Mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Plaintiff's allegations against EAM fail to state an actionable claim on multiple fronts. *First*, Plaintiff's conclusory assertion that EAM was "a 3(21) ERISA fiduciary" is insufficient to plausibly allege that EAM was a fiduciary with respect to the conduct at issue. *Second*, to the extent Plaintiff alleges anything more than bare conclusions about EAM, those allegations relate to conduct that occurred outside ERISA's six-year limitations period. *Third*, to the extent Plaintiff's claims against EAM are not time-barred, Plaintiff fails to plead any direct or circumstantial allegations showing a faulty process by EAM sufficient to support a plausible inference that it breached its fiduciary duties. *Fourth*, Plaintiff fails to adequately allege that EAM's conduct proximately caused any plan losses. *Finally*, Plaintiff's co-fiduciary liability theory is not supported by a single well-pleaded allegation.

I.   **PLAINTIFF HAS NOT ADEQUATELY ALLEGED THAT EAM WAS AN ERISA SECTION 3(21) FIDUCIARY WITH RESPECT TO THE CONDUCT ALLEGED**

The threshold question in a case alleging breach of fiduciary duty under ERISA is whether the defendant "was acting as a fiduciary (that is, performing a fiduciary function) when taking the action subject to complaint." *Pegram v.*

*Herdrich*, 530 U.S. 211, 226 (2000). A party is a fiduciary with respect to the Plan only "to the extent" he or she: (i) exercises discretionary authority or control over a plan or its assets; (ii) renders investment advice for a fee with respect to any property of a plan; or (iii) has discretionary authority or responsibility with respect to the administration of a plan. 29 U.S.C. § 1002(21)(A)(i)-(iii). Plaintiff's contention that EAM was an "investment advice fiduciary" under Section 3(21)(A)(ii), (*see* Am. Compl. ¶ 14), is a legal conclusion that is irreconcilable with the parties' express agreement regarding the scope of EAM's responsibilities and Plaintiff's own allegations.

In construing Section 3(21), the U.S. Department of Labor has instructed in its regulations that a party is an "investment advice fiduciary" under Section 3(21)(A)(ii) only if: (1) it provided individualized investment advice; (2) on a regular basis; (3) pursuant to a mutual agreement, arrangement, or understanding that; (4) the advice would serve as a primary basis for the plan's investment decisions; and (5) the advice was rendered for a fee. 29 C.F.R. § 2510.3-21. Courts regularly hold that, to plead a viable breach of fiduciary duty claim based on a defendant's alleged status as an investment advice fiduciary, a plaintiff must plead facts sufficient to establish each of these five requirements. *See, e.g.*, *Scott v. Aon Hewitt Financial Advisors*, 2018 WL 1384300, at *6 (N.D. Ill. Mar. 19, 2018) (granting motion to dismiss Hewitt, finding that "[e]ven construing the facts in her favor . . . nowhere in

9

her complaint does Scott allege any facts to support a claim that Hewitt [provided advice] pursuant to a mutual agreement that its advice would serve as a primary basis for the Plan's investment decisions."); *Walker v. Merrill Lynch & Co.*, 2016 WL 4775823, at *5 (S.D.N.Y. Mar. 25, 2016) (dismissing claim against defendant based on plaintiff's failure to plead five elements identified by Department of Labor); *Bhatia v. Dischino*, 2010 WL 1236406, at *6 (N.D. Tex. Mar. 30, 2010) (same); *In re Touch America Holdings, Inc. ERISA Litig.*, 2006 WL 7137416, *8 (D. Mon. June 15, 2006) (dismissing claim where plaintiff did not "allege[] any agreement that [defendant's] advice would serve, or did serve, as the primary basis for any investment decision").

Plaintiff makes no attempt to carry her burden of pleading facts showing that EAM was a Section 3(21) investment advice fiduciary with respect to the Plan. Instead, she relies on conclusory assertions that EAM "was the architect of the Plan's investment policy" and "was the Plan's ERISA 3(21) investment advisor." Am. Compl. ¶ 14. These hollow allegations fail to state a claim. *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions."). Plaintiff does not allege that EAM provided investment advice regularly nor does she allege any facts that could support an inference that EAM and the Retirement Committee both understood that EAM's advice would be the primary basis for the Retirement Committee's investment

decisions. Indeed, Plaintiff's own allegations preclude her from doing so. *See, e.g.*, Am. Compl. ¶ 15 ("BBVA retained and the Committee exercised the discretionary authority to make investment management decision[s]."); *Id.* ¶ 46 ("The Plan is structured as a cafeteria type plan in which participants chose from investment options selected and maintained by BBVA.").

Courts often focus on this particular requirement when addressing claims alleging that a party is liable as an "investment advice fiduciary." *See, e.g.*, *Farm King Supply, Inc. v. Edward D. Jones & Co.*, 884 F.2d 288 (7th Cir. 1989) ("[A]n agreement or understanding must have existed between the parties . . . that [the defendant] would provide to the Plan individualized investment advice which would be the primary basis for the Plan's investment decisions."); *Santomenno v. John Hancock Trust*, 768 F.3d 284, 297 (3d Cir. 2014); *Fuller v. SunTrust Banks, Inc.*, 2019 WL 1996693, *11 (N.D. Ga. Mar. 29, 2019). Plaintiff's failure to allege an understanding between EAM and the Retirement Committee or plausible allegations that EAM's advice was the primary basis for the investment decisions at issue precludes Plaintiff's fiduciary breach claim against EAM.

In fact, Plaintiff cannot show that the parties mutually understood that EAM would serve as an investment advice fiduciary because that would be contrary to the terms of their Service Agreement, which expressly stated that EAM's services were provided "for information purposes only" and that "the provision of such

information **d[id] not constitute** the making or offering of **investment advice**." <u>Ex.</u> <u>E</u>, 2005 Services Agreement, at 10-11 (emphasis added). Given that both EAM and BBVA agreed that EAM's services would not constitute "investment advice," Plaintiff cannot plausibly allege that either defendant expected that the information EAM provided would serve as the primary basis for BBVA's investment decisions. *See Fuller*, 2019 WL 1996693, *11, *13 (holding that no mutual agreement could have existed between plan administrator and third-party service providers where both denied the existence of such an agreement). Where, as here, a services agreement's terms are incompatible with a "mutually-assented to advisory relationship," courts have properly rejected claims that the service provider was an investment advice fiduciary. *See Santomenno*, 768 F.3d at 297 (rejecting claim that defendant was an investment advice fiduciary where parties' agreement expressly disclaimed any fiduciary relationship).

Finally, even if EAM constituted a fiduciary under Section 3(21)(A) for purposes of providing certain investment advisory services (and it does not), that does not mean it was a fiduciary for all purposes. A service provider "may be an ERISA fiduciary with respect to certain matters but not others," such that "fiduciary status exists only to the extent" that the plan service provider "has or exercises the described authority or responsibility over a plan." *Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 366 (2d Cir. 2014) (internal quotation marks omitted); *Stein v.*

*Smith*, 270 F. Supp. 2d 157, 174 (holding that defendant's status as an investment advice fiduciary did not in-and-of-itself give rise to a fiduciary duty "to investigate and adequately monitor" plan investments); *Plumb v. Fluid Pump Service, Inc.*, 124 F.3d 849 (7th Cir. 1997) (service provider did not have any fiduciary obligation to perform services beyond those set forth in services agreement). By agreeing to "assist [BBVA] with identifying mutual funds that [were] consistent . . . with the Plan's investment policies, objectives, and guidelines," (Ex. E, 2005 Services Agreement, at 2) (emphasis added), EAM did not assume *de facto* control over the Plan's funds or responsibility for perpetually re-evaluating them and guaranteeing their prudence. Likewise, EAM's agreement to review the Plan's funds and provide the Retirement Committee quarterly reports on certain aspects of their performance and compliance with the Plan's IPS, (*id.* at 2 ("[EAM's] reports and presentations additionally will include . . . detailed information about each Fund's status according to the applicable Plan investment policies, objectives, and guidelines, and such other details about each individual fund . . . as the Plans' Retirement Committee may reasonably request.")), did not saddle EAM with the ill-defined and all-encompassing "duty to monitor" that forms the basis for Plaintiff's claims.

Because Plaintiff has failed to allege facts sufficient to support a finding that EAM was a Section 3(21) investment advice fiduciary, and her conclusory allegations are irreconcilable with the parties' Services Agreement, Plaintiff cannot

state a plausible claim against EAM. Moreover, even if Plaintiff could show EAM was a Plan fiduciary, she has not plausibly alleged that EAM's fiduciary responsibilities extended to the conduct complained of. As such, her claims against EAM must be dismissed.

II.  **PLAINTIFF'S CLAIMS AGAINST EAM ARE TIME-BARRED BECAUSE THE FACTS GIVING RISE TO THE BREACH ALL OCCURRED MORE THAN SIX YEARS BEFORE SHE FILED HER COMPLAINT**

Plaintiff's claims against EAM are time-barred. Under ERISA's statute of limitations, no action may be commenced with respect to a fiduciary's alleged breach, at the latest, "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation[.]" 29 U.S.C. § 1113(1). As the Supreme Court has instructed, ERISA's six-year limitations period functions as a "statute of repose," *Intel Corp. Investment Policy Committee v. Sulyma*, 140 S.Ct. 768, 774 (2020), and therefore, it must be strictly enforced to provide an absolute and unambiguous "cutoff" date for bringing claims related to fiduciaries' actions. *See CTS Corp. v. Waldburger*, 573 U.S. 1, 10 (2014) (statutes of repose are "equivalent to a cutoff" or "an absolute bar on a defendant's temporal liability") (internal citations and quotations omitted). Because Plaintiff did not file this lawsuit until December 28, 2020, her claims against EAM are time-

barred because they are based on acts or omissions that occurred before December 28, 2014.

A. **<u>Plaintiff's Stable Value Fund Theory</u>**

Plaintiff claims that all of the defendants, including EAM, breached their fiduciary duties by allegedly failing to identify and offer a suitable replacement for the Plan's original stable value fund, which was removed from the Plan investment lineup in 2012. Am. Compl. ¶¶ 68-73. According to Plaintiff, Defendants' failure to replace the stable value fund resulted in lower investment returns because the assets in the original stable value fund were deposited in a lower-yielding money market fund. Am. Compl. ¶ 73. But as Plaintiff's own allegations and judicially-noticeable facts confirm, the Plan's original stable value fund was closed in **2011** and all of the assets in that fund were moved to the Plan's money market fund by the end of **2012**. *See* Am. Compl. ¶ 68 ("Prior to 2011, the stable value option for the Plan was the SEI Stable Value Asset Fund recommended by Envestnet."); <u>Ex. F</u>, 2012 Form 5500 Annual Report, at 27, 33 ("On October 3, 2011, the SEI Stable Asset Fund was closed to new investments. On August 15, 2012, the SEI Stable Value Asset Fund was completely closed, and all remaining assets were reallocated to the Vanguard Prime Money Market Fund."). Thus, EAM's alleged failure to recommend a replacement for the stable value fund, and its alleged role in moving the fund assets

into the money market fund, occurred in 2012, *i.e.,* **more than eight years** before Plaintiff filed this lawsuit.

In an effort to avoid the preclusive effect of ERISA's six-year limitations period, Plaintiff attempts to reframe her stable value fund claim as a violation of EAM's "duty to monitor" the Plan's investments and ensure compliance with the IPS. Am. Compl. ¶ 75. This pleading tactic is unavailing. The "duty to monitor" is not a magical incantation with the power to transform time-barred claims into timely ones. *Fuller v. SunTrust Banks, Inc.*, 2012 WL 1432306, at *10 (N.D. Ga. Mar. 20, 2012) ("Plaintiff's characterization of her claim as a failure-to-act claim does not immunize it from the six-year period of limitations."). To state a plausible claim, Plaintiff must allege facts establishing an actual monitoring failure that occurred both (a) during the limitations and (b) while EAM was still engaged. *In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101 (S.D.N.Y. 2018); *In re Lehman Bros. Sec. & ERISA Litig.*, 113 F. Supp. 3d 745, 757 (S.D.N.Y. 2015). This she fails to do.

Plaintiff's entire monitoring theory is baseless in any event because once the stable value fund was removed from the Plan's investment lineup in 2012, there was no stable value fund for EAM to monitor. *See infra,* at 31. As for Plaintiff's theory that the IPS required the Plan to offer a stable value fund, Plaintiff ignores the fact that, in August 2014, *i.e.* six years **and five months** before she filed suit, the IPS

was amended to remove any reference to the stable value fund. Am. Compl. ¶¶ 163, 168; Ex. C, 2014 IPS, at 10-12 (identifying investment options and asset classes).

**B. Plaintiff's Active-Management Theory**

Plaintiff's allegations against EAM regarding the Plan's actively-managed investments are equally time-barred. Plaintiff's primary allegation involving EAM here is her supposition that the Retirement Committee acted on EAM's recommendations in including the Plan's various actively-managed investments. Am. Compl. ¶ 4 ("BBVA, acting through the Committee based on the advice and recommendations of Envestnet, failed in its duties from start to finish by . . . making bad bets on mutual funds that incurred additional fees with unrealistic expectations of beating the market"). However, Plaintiff's allegations, the materials appended to the Amended Complaint, and the Plan's Form 5500 filings demonstrate that each allegedly imprudent investment option Plaintiff challenges was part of the Plan's investment lineup **prior to 2014**. *See* Am. Compl. ¶¶ 100, 106 (identifying investment options as of 2013); Am. Compl., Schedule A, App'x at 2 (identifying investment options available between 2013 and 2019); Ex. G, 2013 Form 5500 Annual Report, at 33-35, 38 (identifying plan investments as of 2013). Thus, EAM must have made its allegedly imprudent recommendations regarding these funds more than six years before Plaintiff filed suit.

As with her stable value fund theory, Plaintiff attempts to bring her active-management claims within the six-year limitations period by characterizing them as breaches of the duty to monitor. Am. Compl. ¶¶ 113, 127, 131, 186. Once again, her attempts with respect to EAM are unavailing. As explained above, Plaintiff does not identify any specific "failure to monitor" that plausibly occurred during the limitations period (*i.e.*, after December 28, 2014) but before EAM was terminated (*i.e.* before September 30, 2015). To the extent EAM had a duty to monitor the Plan's investments, that duty was limited to applying the criteria set forth in the IPS as well as providing any additional information requested by the Retirement Committee. Ex. E, 2005 Services Agreement, at 2 ("[EAM's] reports and presentations additionally will include . . . detailed information about each Fund's status according to the applicable Plan investment policies, objectives, and guidelines, and such other details about each individual fund . . . as the Plans' Retirement Committee may reasonably request."). Nothing in the IPS, the Services Agreement, or any other document gave EAM the authority to unilaterally remove funds from the Plan, and indeed, Plaintiff does not argue otherwise.

Nor does Plaintiff plausibly allege that EAM failed to adhere to the IPS's monitoring criteria (or that such a failure would have constituted a fiduciary breach). Rather, she challenges the IPS monitoring criteria themselves as deficient. *See, e.g.*, Am. Compl. ¶ 128 ("The peer group standard was not appropriate for measuring

investment performance in the asset classes in which the Plan was invested."), ¶¶ 140-141 (alleging that Defendants should have benchmarked funds' performance against "the risk adjusted performance of Vanguard index funds in the same asset class" rather than the IPS criteria). In other words, Plaintiff challenges the IPS's instructions, not EAM's failure to adhere to them. Because Plaintiff admits that the Retirement Committee adopted the IPS more than six years before Plaintiff filed suit, (Am. Compl. ¶¶ 47, 168 (alleging that the IPS was originally adopted in 2008 and amended on August 13, 2014)), her claim that EAM breached its fiduciary duties by following the IPS is necessarily time-barred.

C. **Plaintiff's "Cover Up" Theory**

Finally, the straightforward application of ERISA's six-year limitations period to Plaintiff's claim that EAM attempted to "cover up" the poor performance and high cost of the Plan's funds by proposing changes to the IPS's monitoring criteria defeats this claim. *See* Am. Compl. ¶¶ 162-169. Plaintiff alleges that EAM proposed these changes at the Retirement Committee's February 14, 2014, meeting. Am. Compl. ¶ 162. On August 13, 2014, the Retirement Committee adopted some, but not all, of EAM's proposed changes. Am. Compl. ¶ 168. Thus, regardless of whether the alleged breach occurred when EAM proposed the changes to the IPS, or when the Retirement Committee adopted them, Plaintiff's "cover up" theory is untimely.

III.    **THE FACTS PLED IN PLAINTIFF'S COMPLAINT DO NOT SUPPORT A PLAUSIBLE INFERENCE THAT EAM BREACHED ANY FIDUCIARY DUTIES**

Plaintiff has failed to plausibly allege that EAM was a fiduciary to the Plan, both in general and as to the conduct complained of, and her claims are time-barred. In addition to these defects, Plaintiff also fails to state a plausible claim that EAM breached any fiduciary duty. To adequately allege a fiduciary breach, a plaintiff must plead that the fiduciary employed a flawed decision-making process. *Pfeil v. State Street Bank and Trust Co.*, 806 F.3d 377, 384 (6th Cir. 2015); *Cervantes v. Invesco Holding Co., Inc.*, 2019 WL 5067202, at *9 (N.D. Ga. Sept. 25, 2019) Even if Plaintiff had plausibly alleged that EAM was a Plan fiduciary, which she does not, Plaintiff's allegations fall far short of alleging a plausible fiduciary breach against EAM under any of her three theories.

A.    **Plaintiff's Theory That EAM Engaged in a Cover Up Does Not Plead a Plausible Fiduciary Breach**

Plaintiff's lone theory specific to EAM is that EAM allegedly attempted to "cover up" certain of the Plan's investments' performance issues and high costs by proposing changes to the IPS. *See* Am. Compl. ¶¶ 162-181. Specifically, Plaintiff alleges that EAM proposed changes to the IPS to: (1) remove the description of the stable value fund from the IPS; (2) change the performance criteria for the Plan's target date funds; and (3) change the performance criteria for the Plan's mutual funds. Am. Compl. ¶¶ 162-169. In addition to being time-barred, Plaintiff's self-

serving conclusion that these proposed changes were in furtherance of an elaborate cover-up is facially implausible. Furthermore, Plaintiff makes no attempt to show that she or the Plan suffered any losses as a result of this alleged conduct. *See Pledger v. Reliance Trust Co.*, 2019 WL 10886802, at *28 (N.D. Ga. Mar. 28, 2019) (collecting cases holding that plaintiffs bear burden of establishing that the breach caused losses to the plan).

As an initial matter, Plaintiff's assertion that the purpose of the IPS was to "establish objective investment criteria for the Plan's investment options in advance," and that, therefore, ***any*** changes to the IPS were improper, (Am. Compl. ¶ 167), is irreconcilable with both the terms of the IPS and ERISA's fiduciary standards. Under the IPS's explicit language, the Retirement Committee was required to review the IPS annually to ensure its "continued appropriateness . . . for the benefit of the Plan." Ex. B, 2008 IPS, at 15. These annual reviews not only authorized EAM to propose changes, they are consistent with ERISA's duty of prudence, which requires fiduciaries to employ the degree of care, skill, prudence, and diligence that a similarly-situated fiduciary would employ "under the circumstances then prevailing." 29 U.S.C. § 1104. Plaintiff's contention that fiduciaries are perpetually bound to past investment policies simply because they were memorialized in an initial investment policy statement is untenable, and not surprisingly, she offers no support for such a position.

Furthermore, a close examination of EAM's proposed changes to the IPS shows that Plaintiff's cover up theory is implausible at best (and nonsensical at worst). *First,* Plaintiff's speculation that EAM sought to remove the stable value fund description to cover up for the money market funds' performance, (Am. Compl. ¶ 163), is illogical. Under the 2008 IPS, stable value funds and money market funds were distinct asset classes, each with their own benchmarks and monitoring criteria. Ex. B, 2008 IPS, at 10. Plaintiff does not explain how amending the 2008 IPS to eliminate the stable value fund asset class had any effect on EAM's or the Retirement Committee's evaluation of the money market fund. The change (which occurred before the class period in any event) simply updated the list of available asset classes to reflect the fact that the investment lineup no longer included certain options, like a stable value fund. ECF No. 34-2, Complaint Exhibit B, May 23, 2014 Meeting Minutes, at 3, 8 ("[EAM] reported the need to update the available asset classes and funds within the SIP[.]"). As the Retirement Committee put it, this change was a "general administrative update." ECF No. 34-3, Complaint Exhibit C, August 13, 2014 Meeting Minutes, at 2 (describing changes as "general administrative updates"). Given this obvious alternative explanation, Plaintiff's self-serving and speculative theory that the change was part of a cover-up, as opposed to a mere clean up, is implausible.[6] *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290

---

[6] Plaintiff also includes in the alleged cover-up EAM's proposed change to the description of the Plan's

(11th Cir. 2010) ("Importantly, the Court held in *Iqbal*, as it had in *Twombly*, that courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.").

*Second*, in addition to being time-barred, Plaintiff's contention that EAM "watered down" the IPS's monitoring criteria for the Plan's target date funds by "removing the *objective* performance criteria in favor of *artificial* criteria," (Am. Compl. ¶ 164), also fails to state a plausible claim. In advancing this theory, Plaintiff ignores the fact that, until EAM's proposed changes in 2014, the IPS did not contain **any** target date fund monitoring criteria. Ex. B, 2008 IPS, at 10-14 (describing criteria for each available asset class). This is only logical since target date funds were not added to the Plan's investment lineup until 2013. *Compare* Ex. F, 2012 Form 5500, at 39 (assets held at year end), *with* Ex. G, 2013 Form 5500, at 38 (same). In other words, EAM could not have "removed" any criteria, because criteria did not exist until the 2014 amendments. Furthermore, the criteria adopted were not "artificial." The target date funds were evaluated based on their performance relative to assigned benchmark indices. Ex. C, 2014 IPS, at 12 (identifying S&P Target Date

---

different investment vehicles, (Am. Compl. ¶ 166), but she does not explain how this change concealed any information from the Retirement Committee. Regardless, the judicially-noticeable documents referenced in the Amended Complaint demonstrate that this change was also administrative. *See* ECF No. 34-2, Complaint Exhibit B,  May 23, 2014 Meeting Minutes, at 2 (noting that changes were intended to "make language more specific to mutual funds in the plan").

indices as the primary benchmarks for the Plan's target date funds). This was the same "objective" criteria used to evaluate all of the Plan's investments. The monitoring criteria Plaintiff criticizes actually supplemented, rather than supplanted, the IPS's "objective" criteria. Ex. C, 2014 IPS, at 13 (identifying "supplemental performance guidelines" for the target date funds because of "the inherent limitations in benchmarking target retirement date funds").

As for the Plan's mutual funds, Plaintiff contends that EAM proposed replacing the "3 and 5 year sharpe ratio vs. index and peer median" performance criteria with a quantitative process that EAM "made up." Am. Compl. ¶ 165. Not only does Plaintiff fail to explain how EAM's alleged quantitative process would have covered up any (non-existent) underperformance, she completely ignores the fact that EAM's proposal **was never adopted** by the Retirement Committee. Ex. D, 2014 IPS (Redline), at 13 (discussing guidelines for placing investments on "watch" status and reflecting the fact that there was no change to the sharpe ratio performance criteria). Not only does Plaintiff fail to allege that any of EAM's proposed changes to the IPS caused her and the Plan any losses, any inference of harm is particularly implausible given that those changes were never adopted. *Willett v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335, 1343 (11th Cir. 1992) (holding that alleged breach must proximately cause the alleged losses).

**B.** **Plaintiff's Active Management Claims Have Been Repeatedly Rejected By The Courts**

Plaintiff's allegations regarding the Plan's actively-managed investments also fail to support a plausible claim against EAM. Rather than identify any specific act or omission by EAM during the nine months of the limitations period that EAM was engaged (*i.e.,* December 28, 2014, to September 30, 2015), Plaintiff relies on (i) generic assertions about the imprudence of active management, (ii) conclusory allegations that EAM "failed to monitor" the Plan's investments, and (iii) hindsight assessments of investment performance long-after EAM was terminated. Plaintiff's scattershot allegations miss the mark.

1.  Plaintiff's Critiques of Active-Management are Inapposite

Rather than point to any specific deficiencies in the process EAM employed when making its recommendations, Plaintiff spills much ink explaining why she believes that actively-managed investments are generally "bad bets" compared to passively-managed investment options. *See* Am. Compl. ¶¶ 117-125. In so arguing, Plaintiff ignores that courts have repeatedly rejected ERISA plaintiffs' tired lectures on the supposed superiority of index fund investing and passively-managed funds. *Davis v. Wash. Univ. in St. Louis,* 960 F.3d 478, 484 (8th Cir. 2020); *Loomis v. Exelon Corp.*, 658 F.3d 667, 673 (7th Cir. 2011); *Kurtz v. Vail Corp.*, 2021 WL 50878, at *10 (D. Colo. Jan. 6, 2021) ("[P]laintiff's complaint reads as suggesting that actively-managed funds can **never** be a prudent choice, which cannot be true.

Many courts have concluded that choosing actively-managed funds *per se* over [passively] managed funds is not a breach of fiduciary duty."); *Davis v. Salesforce.com*, 2020 WL 5893405, at *3 (N.D. Cal. Oct. 5, 2020) (rejecting notion that actively-managed funds are somehow inherently less prudent than passively-managed alternatives); *Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273, 313 n.114 (S.D.N.Y. 2018) (same). Courts have consistently acknowledged the differences between active and passive funds and held that including the former in a fund lineup does not support a fiduciary breach claim. As the Eighth Circuit succinctly put it, actively-managed and passively-managed investments "have different aims, different risks, and different potential rewards that cater to different investors. Comparing apples and oranges is not a way to show that one is better or worse than the other." *Davis*, 960 F.3d at 485. Simply put, Plaintiff's broadside attacks on active-management do not state a claim.

> 2.   Plaintiff Does Not Plausibly Allege That EAM Failed to Monitor the Plan's Investment Fees

Even if EAM had a fiduciary duty to monitor the Plan's investment fees, comparing the Plan's funds' fees to those of passively-managed Vanguard index funds—an "apples-to-oranges" comparison—says nothing about the prudence of selecting and retaining an actively-managed investment. For that reason, courts have properly rejected such comparisons. *See e.g.*, *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 n.4 (8th Cir. 2018) (dismissing claims comparing plan's funds to

Vanguard alternatives and finding that "the district court was correct to recognize a potential pattern of plaintiffs trying to convert failure to invest in Vanguard, without more, into a breach of fiduciary duty"); *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338 (2d Cir. 2006) ("That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion[.]"). In any event, even if Plaintiff's comparisons were apt (and they are not), courts have recognized time and again that the existence of cheaper alternative investments in the marketplace does not support a plausible inference of a fiduciary breach claim. *See, e.g.*, *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009); *Meiners v. Wells Fargo & Co.*, 2017 WL 2303968 (D. Minn. May 25, 2017) (refusing to infer imprudence based on relative cost compared to two purported alternatives where there was no evidence the alternatives were representative of the market as a whole), *aff'd*, 898 F.3d 820 (8th Cir. 2018). Fiduciaries are not required to "scour the market to find and offer the cheapest possible fund." *Fuller v. Suntrust Banks, Inc.*, 2019 WL 5448206, at *27 (N.D. Ga. Sept. 30, 2019) (quoting *Hecker*, 556 F.3d at 586).

Plaintiff's allegation that EAM improperly used a Morningstar "peer group" that was not limited to institutional funds to monitor fees cannot save her claim. Am. Compl. ¶ 105. As discussed above, the criteria used to monitor the Plan's investments, including their fees, were expressly delineated in the IPS, (*see supra*,

at 5, 11), which required the Plan's funds to be benchmarked against their respective "peer group[s]." Ex. C, 2014 IPS, at 7. The IPS did not require the peer group to be constructed in any particular way, much less restricted to institutional funds. And as explained above, to the extent Plaintiff is claiming the IPS should have imposed such a requirement, her claim is time-barred..

Even if EAM was required to construct the comparator peer groups in a particular way, a peer group comprised entirely of "institutional" funds would not provide a meaningful benchmark because defined contribution plan investment lineups are not required to offer only institutional funds. Plan fiduciaries may satisfy their fiduciary obligations by offering a wide array of investment vehicles. *See Hecker*, 556 F.3d at 586 ("[N]othing in the statute [] requires plan fiduciaries to include any particular mix of investment vehicles in their plan."); *Tibble v. Edison Int'l*, 729 F.3d 1110, 1136 (9th Cir. 2013) (rejecting argument that plan fiduciaries should offer only institutional class funds because "[t]here are simply too many relevant considerations for a fiduciary for that type of bright-line approach to prudence to be tenable"), *vacated on other grounds*, 135 S. Ct. 1823 (2015); *White v. Chevron Corp.*, 2016 WL 4502808, at *10-11 (N.D. Cal. Aug. 29, 2016) (discussing variety of investment vehicles fiduciaries are permitted to offer). Thus, Plaintiff cannot plausibly allege that a peer group comprised entirely of "institutional" shares would have been a "meaningful benchmark" and

representative of the costs paid by a similarly-situated plan participant. *Meiners*, 898 F.3d at 822.

Finally, Plaintiff's breach of fiduciary duty claim fails because she has not (and cannot) plead a plausible connection between using Morningstar peer groups to benchmark fees and any losses to the Plan. *Willett*, 953 F.2d at 1343. The IPS did not require the Retirement Committee to offer only funds with expense ratios below the peer group median or average; rather, the IPS guidelines provided that their investment fees should be "comparable" to their peer group. Ex. C, 2014 IPS, at 7. The Plan's funds' fees were clearly "comparable" whether measured against their Morningstar peer group or a peer group of all institutional funds. *Compare* Am. Compl. ¶ 106 (comparing fees to Morningstar Peer Groups) *with* ¶ 107 (comparing fees to "all institutional" funds). In fact, to the extent that certain of Plan's funds' fees exceeded the alleged median for institutional shares, none exceeded the median by more than 10 basis points (*i.e.*, one-tenth of one percent). *See id*. Plaintiff's argument that the Retirement Committee would have removed these funds from the Plan's lineup if presented with a one-tenth of one percent fee differential is nothing more than unsupported speculation that cannot support a plausible claim. *Iqbal*, 556 U.S. at 678 ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully.").

3.  Plaintiff's Allegations Do Not Plausibly Claim That EAM Failed to Monitor Performance

Plaintiff's contentions, (Am. Compl. ¶¶ 126-161), that EAM breached a fiduciary duty by failing to monitor the Plan's funds pursuant to the performance criteria in the IPS, or in the alternative, that those criteria required that the Plan offer different funds, is equally implausible. First and foremost, the parties' Services Agreement expressly provided that EAM had no responsibility for a fund's performance, (Ex. E, 2005 Services Agreement, at 11), and Plaintiff makes no showing that EAM had any authority to unilaterally remove poorly performing funds, (Am. Compl. ¶¶ 12-13). Moreover, the IPS instructed the Retirement Committee to flag for closer monitoring only those investments whose 3-year and 5-year risk adjusted performance lagged **both** their benchmark indices and their peer group benchmarks.[173] Ex. C, 2014 IPS, at 8, 12. Plaintiff cannot state a plausible claim that EAM breached a fiduciary duty to monitor the Plan's investments when EAM was employing the monitoring process that governed the Plan. *California Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1042 (9th Cir. 2001) ("Fiduciaries who are responsible for plan investments governed by ERISA must comply with the plan's written statements of investment policy[.]") Plaintiff's half-baked criticism that EAM used "proprietary" peer groups also cannot support a plausible claim. Plaintiff concedes that she does not know anything about

---

[7] The "benchmark index" tracks the performance of a particular market, as opposed to the performance of a particular fund; the "peer group," by contrast, tracks the average performance of a group of similar mutual funds. Am. Compl. ¶¶ 52, 118.

the composition of these peer groups, (Am. Compl. ¶ 58 n.23), and therefore, she cannot possibly compare them to any alternatives. Plaintiff also does not allege that the Plan's funds' relative performance would have been any different had EAM used a "third-party peer group," nor does she allege that using EAM's proprietary peer groups had any effect on the Plan's investment lineup.

Additionally, Plaintiff fails to allege sufficient facts challenging the performance of Plan investments during the nine months of the relevant period that EAM was the Plan's investment consultant. *See* Am. Compl. ¶ 14. Plaintiff almost exclusively relies on the relative performance of the Plan's investments compared to her cherry-picked alternatives from 2013-2020. EAM was only engaged during **two** of these seven years. *Id.* ¶ 146, Schedule F, Schedule G. Even if Plaintiff's comparisons were appropriate and reflected actual underperformance, Plaintiff's allegation that EAM acted imprudently by not insisting that BBVA completely overhaul the Plan's investment lineup based on a single year or two of supposed underperformance is implausible. *Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (it is not imprudent "to stay with . . . mutual funds even during years of lower performance"); *White*, 2016 WL 4502808, at *17 (collecting cases holding that an isolated period of underperformance does not support a plausible inference of an imprudent process); *DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990).

The last nail in the coffin with respect to Plaintiff's duty to monitor claim against EAM is that she fails to identify any specific monitoring failure by EAM during the relevant nine-month period. With respect to this nine-month period, Plaintiff musters only a single performance scorecard from December 31, 2014. Am. Compl. ¶ 131. Plaintiff's contention that this scorecard somehow establishes the imprudence of the Plan's investment strategy is based entirely on her idiosyncratic and untenably narrow interpretation of the IPS as requiring that funds be removed if their risk adjusted returns **ever** underperformed their benchmark indices. *Id.* That is not what the IPS required. *See supra*, at 24. Plaintiff also ignores the fact that the scorecard shows that nearly all of the Plan's mutual funds had outperformed their peer group benchmarks over the preceding 3- and 5-year periods. Am. Compl. ¶ 131 (noting that 14 of 18 funds outperformed their peer group benchmarks over both the 3-year and 5-year period). In addition, far from supporting a plausible claim that EAM failed to monitor the Plan's investments, the scorecard and the analysis accompanying it affirmatively demonstrate that EAM was actively monitoring the Plan's investments in accordance with the IPS criteria. Finally, from a legal standpoint, even if this one scorecard reflected a period of underperformance (and it does not), allegations that a fund underperformed at a single point in time are not sufficient to support a plausible inference of imprudence. *Jenkins*, 444 F.3d at 926;

*White*, 2016 WL 4502808, at *17 (collecting cases holding that an isolated period of underperformance does not support a plausible inference of an imprudent process).

    4.    <u>Plaintiff Does not Plausibly Allege That EAM Failed to Consider Lower Cost Investment Vehicles</u>

Plaintiff's contention that EAM failed to consider lower cost investment vehicles for the Plan, such as institutional class mutual funds, is belied by her own allegations. Am. Compl. ¶ 143. First, it is undisputed that throughout EAM's tenure, the Plan offered multiple institutional class funds, including the Vanguard Institutional Index fund, which charges just 4 bps (0.04%). *Id.* ¶ 108; *see also id.* ¶ 106 (identifying institutional class shares for the Harbor Capital Appreciation Fund, the Principal MidCap Value Fund, and the American Century Diversified Bond Fund). As for Plaintiff's allegation that EAM should have considered "collective investment trusts" or "separately managed accounts," courts have expressly and unequivocally held that "there is no fiduciary duty to investigate alternatives to mutual funds." *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 212 (D. Mass. 2020); *see also Parmer v. Land O'Lakes, Inc.*, 2021 WL 464382, at *7 (D. Minn. Feb. 9, 2021); *Dorman v. Charles Schwab Corp.*, 2018 WL 6803738, at *3-4 (N.D. Cal. Sept. 20, 2018); *White*, 2016 WL 4502808, at *10. And to discredit Plaintiff's claim even further, as the *Moitoso* court noted, although collective investment trusts may be cheaper in some circumstances, they are subject to unique regulatory and transparency features that make any comparisons "apples-to-oranges." *Moitoso*, 451

F. Supp. 3d at 212. ERISA does not permit a fiduciary breach claim premised on nothing more than a plaintiff's preferred investment option. *Divane v. Northwestern Univ.*, 953 F.3d 980, 989 (7th Cir. 2020) ("It would be beyond the court's role to seize ERISA for the purpose of guaranteeing individual litigants their own preferred investment options.").

> 5. <u>Plaintiff's Allegations Regarding WTW's "Corrections" Do Not Support Her Active-Management Theory</u>

Plaintiff's contention that WTW "corrected" EAM's mistakes by making certain changes to the Plan's investment lineup after EAM's engagement ended is contrary to even the limited evidence that this Court may consider at the motion to dismiss stage. Although Plaintiff characterizes WTW's changes as an "overhaul" of the Plan's investment lineup, in truth WTW's changes were limited to (1) adding two additional index funds to the Plan's investment lineup and (2) replacing the Principal suite of target date funds with a suite of Vanguard target date funds. *Compare* <u>Ex. H</u>, 2019 Form 5500 Annual Report, at 36 (identifying investment options) *with* <u>Ex. G</u>, 2013 Form 5500 Annual Report, at 38 (identifying investment options).

Plaintiff also claims that WTW "tightened the Sharpe ratio standard, requiring the funds selected to outperform their benchmark indices over 3-year periods" and "relied on peer groups established by an independent third-party, Morningstar." Am. Compl. ¶¶ 174-75. But neither of those changes altered the criteria that EAM was

required to employ while it was the Plan's investment consultant. The IPS always required the Plan's investments to be evaluated based on how their Sharpe ratios compared to benchmark indices over a 3-year period, (Ex. B, 2008 IPS, at 11), and the Plan always used Morningstar peer groups to benchmark its investment fees. Am. Compl. ¶ 106. WTW's changes fall far short of supporting any inference that EAM acted imprudently. To the contrary, the fact that WTW recommended so few changes over a span of several years demonstrates that EAM's recommendations were consistent with what similarly-situated fiduciaries would have recommended under the circumstances. As courts have recognized, alternative methods of operating a plan do not show that the path chosen was imprudent. *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) ("[S]o long as the 'prudent person' standard is met, ERISA does not impose a duty to take any particular course of action if another approach is preferable.").

### 6. Plaintiff Lacks Standing With Respect to Investments She Never Selected

For all of the above reasons, Plaintiff's allegations related to the Plan's actively-managed investment options are subject to dismissal pursuant to Rule 12(b)(6) for failure to state a claim. Additionally, with respect to two of these funds, dismissal is appropriate pursuant to Rule 12(b)(1) because Plaintiff lacks Article III standing. To establish standing under Article III, Plaintiff must allege an

individualized injury-in-fact that would be redressed by the requested judicial relief. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). Because Plaintiff did not invest in either the JPMorgan MidCap Growth Fund or the Principal MidCap Value Fund, (*See* <u>Ex. I</u>, Account Statements 2013-2017, at 1-2 (identifying Plaintiffs' investments)), she cannot plausibly claim that she was injured by Defendants' allegedly imprudent decision to offer those funds as investment options. *Fuller v. SunTrust Banks, Inc.*, 2012 WL 1432306, at *8 (N.D. Ga. Mar. 20, 2012) ("Plaintiff, beyond the bare assertion that a breach of fiduciary duty harms all plan participants, has not described how the offering of a fund in which she did not invest caused her a non-speculative injury."); *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at *8-10 (D.D.C. Jan. 8, 2019). ("Since Mr. Wilcox did not invest in the TIAA Real Estate Account, he has no standing to complain about its performance because he [] has no injury to show."). Accordingly, Plaintiff's claims related to the MidCap Growth and MidCap Value funds must be dismissed.

C.      **Plaintiff's Claim That EAM Failed To Monitor the Stable Value Fund Is Incoherent And Incompatible With The IPS Requirements**

Like her challenge to the Plan's actively-managed investments, Plaintiff's claim that it was a breach of fiduciary duty for the Plan not to offer a stable value fund is, at best, tenuously connected to EAM. The Amended Complaint contains just three allegations about EAM with respect to Plaintiff's stable value claim: (1) that "BBVA and [EAM] left proceeds from the liquidation of the SEI stable value fund

in the money market fund" instead of reinvesting those proceeds in a different stable value fund; (2) that BBVA and EAM assigned the stable value fund an inappropriate benchmark for purposes of assessing its performance; and (3) that BBVA and EAM failed to "monitor[] the performance of the money market fund" to ensure that it "satisfied the requirements of the stated investment policy and participants' financial needs." Am. Compl. ¶¶ 73, 75, 83. These allegations are insufficient to support a plausible claim.

       1.    <u>EAM cannot be held liable for the handling of the Plan assets after the stable value fund was eliminated</u>

Plaintiff's claim regarding replacing the stable value fund comes too late. *See supra*, at 15. But even if it was timely, her efforts to implicate EAM in claiming a fiduciary breach by failing to replace the Plan's original stable value fund with a different stable value fund is disproven by her own allegations. EAM had no authority to select the Plan's investments. Am. Compl. ¶ 15 ("BBVA retained and the Committee exercised discretionary authority to make investment management decisions."). Plaintiff does not allege any facts showing that EAM had authority to act independent of the Retirement Committee, nor can she given the terms of the Services Agreement and the IPS limiting EAM's role to assisting the Retirement Committee in fulfilling its fiduciary duties. <u>Ex. E</u>, 2005 Services Agreement, at 2; <u>Ex. B</u>, 2008 IPS, at 4-5. Plaintiff also does not allege that EAM had any control or influence over how participants' stable value fund investments were reinvested once

that fund was closed. Am. Compl. ¶ 73 ("BBVA deposited the proceeds into the Plan's existing money market account, where they remained over the entire class period, in violation of the IPS and ERISA's prudent investor standard.").

### 2. The benchmark previously assigned to the stable value fund is irrelevant

Plaintiff also alleges that EAM's decision to use "the 90 day T-bill as a benchmark [for the stable value fund] artificially lowered the expected return for the stable value asset class and masked the poor performance of the asset class." Am. Compl. ¶ 67. But whether the 90 day T-Bill was an appropriate benchmark for the stable value asset class is irrelevant because, once the stable value fund was removed from the Plan in 2012, there was no longer any stable value fund to benchmark. To the extent Plaintiff is claiming that this allegedly improper benchmark "artificially lowered the expected return for the stable value asset class" during the period when the stable value fund was offered (*i.e.,* from 2005 to 2012), her claim is time-barred.

### 3. Plaintiff's allegation that EAM failed to monitor the stable value fund is nonsensical

Plaintiff's only other allegation regarding EAM related to the stable value fund is that EAM and BBVA failed to "monitor[] the performance of the money market fund," which Plaintiff contends "did not satisfy the requirements of the stable value/short-term bond asset class." Am. Compl. ¶¶ 75-76. Plaintiff's theory makes little sense because the performance of the money market fund (and EAM's

monitoring of that fund) has nothing to do with the Plan's decision not to offer a stable value option. The IPS treats money market funds and stable value funds as distinct asset classes. Moreover, Plaintiff fails to allege any facts regarding how EAM's process for monitoring the money market fund was deficient. For example, Plaintiff does not allege any facts showing (1) the money market fund's performance relative to its IPS benchmarks, (2) how EAM failed to comply with the monitoring criteria set forth in the IPS, or (3) what a prudent fiduciary in like circumstances would have done to monitor the money market fund. Am. Compl. ¶¶ 74-83 (discussing failure to monitor the stable value/money market funds).

Plaintiff tries to avoid the incongruity inherent in her claim by alleging that the Plan was required to offer a stable value fund, either as a matter of fiduciary prudence or pursuant to the IPS. Both theories are baseless, legally and factually. Nothing in ERISA mandates that plan fiduciaries offer **any** particular investment options or asset classes, much less a stable value fund option. *Divane*, 953 F.3d at 989 ("It would be beyond the court's role to seize ERISA for the purpose of guaranteeing individual litigants their own preferred investment options."); *White*, 2016 WL 4502808, at *7 ("Offering a money market fund as one of an array of mainstream investment options along the risk/reward spectrum more than satisfie[s] Plan fiduciaries' duty of prudence."). As for the IPS, nothing in it mandated that particular investment options, such as a stable value fund, be offered; to the contrary,

BBVA always had full authority to add, replace, or remove any investment option offered to the Plan's participants. Ex. B, 2008 IPS, at 5 ("[BBVA] reserves the right to add, delete, or replace options or vehicles representing each option[.]"). Similarly, the Retirement Committee was free to amend the IPS to reflect changes to the types of investments or asset classes available under the Plan, (*id.* at 15), which it did in August 2014. Thus, even if the IPS historically required the Retirement Committee to offer investments in each asset class listed, as of August 2014, the stable value fund asset class was no longer listed.[14]

Finally, to the extent Plaintiff claims that the Plan should have offered a stable value fund because of the strength of its performance relative to money market funds, her theory is based on improper hindsight assessments of performance. Plaintiff relies almost exclusively on performance comparisons of the two options over a seven-year period (2013-2020) preceding the filing of this lawsuit. Am. Compl. ¶ 82. Hindsight comparisons of performance such as these are irrelevant when it comes to assessing the prudence of fiduciary decisions. *Pension Benefit Guar. Corp. ex rel. St. Vincent v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 716 (2d Cir. 2012) ("A fiduciary's actions are judged based upon information available to the fiduciary at the time of each investment decision and not from the vantage point

---

[14] If Plaintiff's assertion that the IPS dictated the types of investments available to participants is correct, the Retirement Committee was **prohibited** from offering a stable value fund once the amended IPS was adopted.

of hindsight."). Moreover, EAM was not the Plan's investment consultant during the majority of the seven-year comparison period. An investment advisor is not expected to know with certainty how an investment will perform years into the future, particularly when that future period post-dates the advisor's termination. ERISA "requires prudence, not prescience." *DeBruyne*, 920 F.2d at 465. EAM had no authority to add or remove an investment from the Plan while it served as a consultant; it certainly had no authority to do so once its tenure as investment consulted had ended.

## IV. PLAINTIFF HAS FAILED TO ADEQUATELY PLEAD A LOSS ATTRIBUTABLE TO ANY OF EAM'S ALLEGED BREACHES

Under ERISA's fiduciary liability provisions, a fiduciary is only liable for those "losses to the plan **resulting from** each such breach." 29 U.S.C. § 1109(a) (emphasis added). The Eleventh Circuit has interpreted this provision as "requir[ing] that the breach of the fiduciary duty be the proximate cause of the losses claimed." *Willett*, 953 F.2d at 1343 (11th Cir. 1992). Because of this requirement, a fiduciary is not liable where his actions, "although a breach of his fiduciary duty, did not cause the loss to the Fund." *Ironworkers Local No. 272 v. Bowen*, 695 F.2d 531, 536 (11th Cir. 1983). It is the plaintiff's burden to prove that each breach resulted in losses to her plan account, not the defendant's burden to disprove causation. *Willett*, 953 F.2d at 1343-44 ("On remand, the burden of proof on the issue of causation will rest on the beneficiaries[.]").

Here, Plaintiff's conclusory and speculative allegations do not support a plausible inference that any alleged breach by EAM caused her losses. Throughout the Amended Complaint, Plaintiff alleges that the Plan suffered millions of dollars in losses attributable to the failure to replace the stable value fund, (Am. Compl. ¶¶ 88-89), the relative underperformance of the Plan's actively-managed investments compared to passively-managed index funds, (Am. Compl. ¶¶ 146-147), and excessive fees charged by the Plan's mutual funds, (Am. Compl. ¶¶ 185-186). But Plaintiff's allegations attribute these losses to BBVA's failure to add, remove, or replace various investment options, not any alleged breach by EAM. *See, e.g.*, Am. Compl. ¶ 183 ("Plaintiffs estimate that, to date, the Plan participants have lost an estimated $42 to $67 million of their retirement money as a result of BBVA's mismanagement of the money market and mutual funds."); *id.* ¶ 186 ("With respect to mutual funds, the loss was primarily the result of BBVA's selection and retention . . . of funds that paid excessive fees to investment managers."); *id.* ¶ 187 ("The loss with respect to the money market fund resulted from a total failure by BBVA to manage the Plan's short-term bond fund investments."); *id.* ¶ 181 ("BBVA still has not added a stable value fund or other short-term bond options. The $1.5 million loss in 2020 is particularly regrettable."). Given that EAM did not have the authority to add, remove, or replace any of the Plan's investments, regardless of how allegedly imprudent the investments may have been, Plaintiff cannot plausibly allege that

EAM's conduct was the proximate cause of the Plan's losses. *Willett*, 953 F.2d at 1343. *See also U.S. Commodity Futures Trading Commission v. Southern Trust Metals, Inc.*, 894 F.3d 1313, 1329-30 (11th Cir. 2018) (explaining that "proximate cause" requires a showing that the alleged misconduct was both a "but for" cause and proximate enough to the alleged injury to justify imposing liability).

Plaintiff alleges, for example, that EAM should have used certain very specific peer groups to benchmark the funds' fees and performance (a customized benchmark for the former, but Morningstar for the latter), but she does not draw any connection between these purported "breaches" and the "millions of dollars" in losses the Plan allegedly sustained. Similarly, Plaintiff alleges that EAM attempted to "cover up" the allegedly poor performance of the Plan's investment options by proposing changes to the IPS, but she does not allege that this cover up had any actual effect on the Plan's investment lineup. Finally, even with respect to EAM's recommendations that BBVA include certain investments, Plaintiff fails to allege that BBVA would not have offered those investments but for EAM's recommendations. In other words, Plaintiff fails to allege that the recommendations were "a cause in fact" or "but for" cause of the Plan's losses. *Southern Trust Metals, Inc.*, 894 F.3d at 1329.

## V.   PLAINTIFF'S CO-FIDUCIARY LIABILITY THEORY FAILS AS TO EAM

Plaintiff's perfunctory "co-fiduciary liability" theory tacked on to the end of her complaint should be dismissed out of hand. To state a claim for co-fiduciary liability under Section 405(a), a plaintiff must show that a defendant knowingly participated in, enabled, or failed to take reasonable steps to remedy a breach of which they were aware. 29 U.S.C. § 1105(a). Despite these express requirements, Plaintiff does not offer as much as a single fact in support of her co-fiduciary liability theory. Instead, she merely parrots the statute's language, alleging that "Defendants knowingly participated in the breaches by other plan fiduciaries, knowing that such acts were breaches," and   "failed to make any reasonable efforts under the circumstances to remedy the breaches." Am. Compl. ¶ 234. Such allegations are precisely the type of legal conclusions the Supreme Court sought to stamp out in *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."), and that courts have rejected time-and-again in similar ERISA cases. *Fuller v. SunTrust Banks, Inc.*, 2012 WL 1432306, at *14 (N.D. Ga. Mar. 20, 2012), *abrogated in part on other grounds by*, *Stargel v. SunTrust, Inc.*, 968 F. Supp. 2d 1215 (N.D. Ga. Aug. 7, 2013); *In re Sprint Corp. ERISA Litig.*, 2004 WL 2182186, at *3 (D. Kan. Sep. 24, 2004) (dismissing co-fiduciary claim that "simply parrots the statutory language of the co-

fiduciary liability statute"). Plaintiff's failure to provide any detail whatsoever regarding, *inter alia*, which defendants were aware of which breaches, how they "participated in" or "enabled" those breaches, or what they could have done to remedy those breaches fails to satisfy the minimum pleading standards of Rule 8. Accordingly, Plaintiff's co-fiduciary liability claim should be dismissed.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant EAM respectfully requests that the Court dismiss the claims against it with prejudice.

Respectfully submitted,

/s/ *Nancy G. Ross*
One of the Attorneys for Defendant Envestnet Asset Management, Inc.

OF COUNSEL:
Harlan I. Prater, IV
hprater@lightfootlaw.com
Brooke L. Messina
bmessina@lightfootlaw.com
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 20th Street North
Birmingham, Alabama  35203
(205) 581-0700

Nancy G. Ross (*pro hac vice*)
nross@mayerbrown.com
Richard E. Nowak (*pro hac vice*)
rnowak@mayerbrown.com
Samuel P. Myler (*pro hac vice*)
smyler@mayerbrown.com
Mayer Brown LLP

71 South Wacker Drive
Chicago, Illinois  60606
(312) 782-0600

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of April, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

s/*Harlan I Prater, IV*
Of Counsel